Hugo PRINCZ, Appellee,

v.

**FEDERAL REPUBLIC OF GERMANY, Appellant.**

Nos. 92–7247, 93–7006.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 5, 1993.

Decided July 1, 1994.

As Amended July 1, 1994.

Peter Heidenberger, Washington, DC, argued the cause for appellant. With him on the briefs were Thomas G. Corcoran, Jr. and Kathleen S. Rice, Washington, DC.

Steven R. Perles, Washington, DC, argued the cause for appellee. With him on the brief was David E. Sher, Arlington, VA.

On the brief for amici curiae The Anti–Defamation League, The Intern. Ass'n of Jewish Lawyers and Jurists, and Faculty Members of the American University, Washington College of Law, were Jill Kahn Meltzer, Sheldon H. Klein, David M. Levine, Steven M. Roth, and Warren L. Dennis, Washington, DC.

Nicholas N. Kittrie, Washington, DC, entered an appearance for amicus curiae Washington College of Law.

Before WALD, GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Dissenting opinion filed by Circuit Judge WALD.

GINSBURG, Circuit Judge:

Hugo Princz, a Holocaust survivor, brought suit in the district court against the Federal Republic of Germany to recover money damages for the injuries he suffered and the slave labor he performed while a prisoner in Nazi concentration camps. The district court asserted subject matter jurisdiction over Mr. Princz's claim, and Germany appealed pursuant to 28 U.S.C. § 1292. *See Foremost McKesson v. Islamic Empire of Iran,* 905 F.2d 438, 443 (D.C.Cir.1990) (district court's denial of foreign state's motion to dismiss on ground of sovereign immunity held immediately appealable).

We now hold, for the reasons set out below, that the district court does not have subject matter jurisdiction of Mr. Princz's claims. Assuming that the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–1611, applies retroactively to events occurring in 1942–1945, no exception to the general grant of sovereign immunity in that statute applies in this case. If the FSIA does not apply retroactively, then there is no federal subject matter jurisdiction over Mr. Princz's claims, which sound in tort and quasi contract.

## I. BACKGROUND

When the United States declared war against Nazi Germany in 1942, Hugo Princz, an American and a Jew, was living with his parents, his sister, and his two brothers in what is now Slovakia. The Slovak police arrested the entire Princz family as enemy aliens and turned them over to the Nazi SS. Rather than allow the Princz family to return to the United States as part of the civilian prisoner exchange then being conducted by the Red Cross, because they were Jews the SS sent them to concentration camps. Mr. Princz's parents and his sister were murdered at Treblinka, while Mr. Princz and his two younger brothers were sent to Auschwitz and then to Birkenau, where they were forced to work at an I.G. Farben chemical plant. After being injured at work, Mr. Princz's brothers were starved to death in the "hospital" at Birkenau. Mr. Princz was later marched to Dachau, where he was forced to work in a Messerschmidt factory.

When United States soldiers liberated Mr. Princz at the end of the war, he was in a freight car full of concentration camp prisoners en route to another camp for extermination. The other liberated prisoners were sent to displaced persons camps, but because Mr. Princz is an American he was sent to an American military hospital for treatment.

After the war the government of the new Federal Republic of Germany established a program of reparations for Holocaust survivors. The German government denied Mr. Princz's 1955 request for reparations, however, because Mr. Princz was neither a German citizen at the time of his imprisonment nor a "refugee," within the meaning of the Geneva Convention, after the war. It appears that Mr. Princz would have qualified for reparations when the German government changed the criteria for eligibility in 1965, but he did not apply again before the statute of limitations ran in 1969.

Beginning in 1984 Mr. Princz, joined by the United States Department of State and members of the New Jersey congressional delegation, initiated a series of requests to the German government and the U.S. subsidiaries of I.G. Farben (BASF, Hoechst, and Bayer) for reparations in the form of *ex gratia* payments or the establishment of a pension fund; all such requests were denied. As the 1991 Treaty on the Final Settlement with Respect to Germany was awaiting ratification by the Senate, the Bush Administration attempted anew to resolve Mr. Princz's claim through diplomatic channels. That effort failed, as have the overtures that the Clinton Administration later made to the government of Germany.

In 1992, Mr. Princz finally resorted to federal district court, filing this action against Germany for false imprisonment, assault and battery, and negligent and intentional infliction of emotional distress, as well as recovery quantum meruit for the value of his labor in the I.G. Farben and Messerschmidt plants. After acceding to service of process, Germany moved to dismiss per Fed. R.Civ.P. 12(b)(1), asserting lack of subject matter jurisdiction owing to sovereign immunity, and under Rule 12(b)(6), asserting that

Mr. Princz failed to state a claim upon which relief could be granted owing to the statute of limitations having run.

The district court held that it had jurisdiction of the case on the ground that the FSIA "has no role to play where the claims alleged involve undisputed acts of barbarism committed by a one-time outlaw nation which demonstrated callous disrespect for the humanity of an American citizen, simply because he was Jewish." 813 F.Supp. 22, 26 (D.D.C. 1992). As we shall see below, that is not the law.

## II. ANALYSIS

■ Germany argues that the district court lacks subject matter jurisdiction over Mr. Princz's complaint for damages sounding in tort and quasi contract because the FSIA is the only basis for obtaining jurisdiction over a foreign sovereign in the courts of the United States and this case comes within no exception to the rule of sovereign immunity codified in that Act. In the alternative, Germany argues that the FSIA does not apply retroactively to this case, and that Germany is therefore entitled to absolute sovereign immunity under the law of this circuit as it stood at the time the Nazis enslaved Mr. Princz. All of these questions concerning Germany's entitlement to sovereign immunity are matters of law for this court to consider *de novo*. *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir. 1994).

### A. *What Law Applies?*

■ The FSIA was enacted in 1976. If it applies to this case, which arose from events occurring from 1942 to 1945, then it "provides the sole basis for obtaining jurisdiction over a foreign state in federal court." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439, 109 S.Ct. 683, 690, 102 L.Ed.2d 818 (1989). Under the Act, the general rule is that of sovereign immunity, subject to various statutory exceptions.

If the FSIA does not apply to this case, then we are presumably remitted to the practice that prevailed in the federal courts during 1942–45, when the events now in suit

occurred. During that time, indeed from 1812, when the Supreme Court decided *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 132, 3 L.Ed. 287, until 1952 the United States, as a matter of grace and comity, granted foreign sovereigns "virtually absolute immunity" from suit in the courts of this country. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486, 103 S.Ct. 1962, 1967, 76 L.Ed.2d 81 (1983). For their part, the courts

> consistently ... deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities.
>
> Until 1952, the State Department ordinarily requested immunity in all actions against friendly foreign sovereigns.

*Id.* (citations omitted).

In the first half of the 20th century the "restrictive" theory of sovereign immunity increasingly gained international acceptance. Restatement (Third) of The Foreign Relations Law of the United States, Ch. 5 p. 391 (1987). Under this approach immunity is confined to the sovereign or public acts of the foreign state and does not extend to its commercial or private acts. The Department of State embraced the restrictive theory of immunity in 1952. Letter from Jack B. Tate, Acting Legal Advisor, to Acting Attorney General Philip B. Perlman (May 19, 1952), reprinted in 26 Dept. State Bull. 984–85 (1952), and in *Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 712–13, 96 S.Ct. 1854, 1869–70, 48 L.Ed.2d 301 (1976). Thereafter the State Department continued to advise courts on a case-by-case basis whether immunity should be granted; if in a particular case no advice was forthcoming, then the courts independently determined whether immunity was appropriate. *Jackson v. People's Republic of China*, 794 F.2d 1490, 1493 (11th Cir.1986).

By enacting the FSIA in 1976, the Congress substantially codified the restrictive theory of sovereign immunity. *Commercial Bank of Kuwait*, 15 F.3d at 241; *Jackson*, 794 F.2d at 1493; H.R.Rep. No. 1487, 94th Cong., 2nd Sess. 7 (1976), U.S.Code Cong. &

Admin.Serv. 1976, p. 6604. Neither the Supreme Court nor this court has yet determined, however, whether the Act applies that theory retroactively. Most courts that have considered the issue of retroactivity have held that FSIA does not apply to events occurring before issuance of the Tate Letter in 1952. *See Carl Marks & Co., Inc. v. Union of Soviet Socialist Republics,* 841 F.2d 26 (2d Cir.1988); *Jackson v. People's Republic of China,* 794 F.2d 1490, 1497–98 (11th Cir.1986); *Slade v. United States of Mexico,* 617 F.Supp. 351 (D.D.C.1985), *aff'd mem.* 790 F.2d 163 (D.C.Cir.1986); *cf. Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 791 (2d Cir.1980) (FSIA does not apply retroactively to case filed before effective date of statute); *but see Yessenin–Volpin v. Novosti Press Agency,* 443 F.Supp. 849, 851 n. 1 (S.D.N.Y.1978) (Act, which merely codified restrictive theory of sovereign immunity adopted in 1952 Tate Letter applies retroactively to action of foreign government taken in 1976). The cases followed the general rule that "retrospective operation will not be given to a statute which interferes with antecedent rights or by which human action is regulated, unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.'" *Union Pacific R. Co. v. Laramie Stock Yards,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913) (citation omitted). And they have held inapplicable the exception for purely remedial measures, because applying the FSIA "to pre–1952 transactions and events would affect foreign sovereigns' antecedent rights adversely." *Carl Marks & Co., Inc. v. Union of Soviet Socialist Republics,* 665 F.Supp. 323, 339 (S.D.N.Y.1987), aff'd 841 F.2d 26 (2d Cir.1988). *Accord Jackson v. People's Republic of China,* 596 F.Supp. 386, 389 (N.D.Ala.1984), aff'd 794 F.2d 1490 (11th Cir.1986); *Slade,* 617 F.Supp. at 358.

There is a strong argument in favor of applying the FSIA retroactively, however. In declaring the purpose of the FSIA, the Congress directed that "[c]laims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter." 28 U.S.C. § 1602.

This suggests that the FSIA is to be applied to all cases decided after its enactment, i.e. regardless of when the plaintiff's cause of action may have accrued. *But see Jackson,* 596 F.Supp. at 388. Moreover, when it enacted the FSIA, the Congress deleted from 28 U.S.C. § 1332 the provision for diversity jurisdiction over suits brought by a United States citizen against a foreign government. According to the House Report on the FSIA, "since jurisdiction in actions against foreign states is comprehensively treated by the new section 1330, a similar jurisdictional basis under section 1332 becomes superfluous." H.R.Rep. No. 94–1487, 94th Cong.2d Sess., 14 (1976). Unless one is to infer that the Congress intentionally but silently denied a federal forum for all suits against a foreign sovereign arising under federal law that were filed after enactment of the FSIA but based upon pre-FSIA facts, the implication is strong that all questions of foreign sovereign immunity, including those that involve an act of a foreign government taken before 1976, are to be decided under the FSIA. *See Yessenin–Volpin,* 443 F.Supp. at 851 n. 1.

Indeed, under the teaching of a recent Supreme Court case, application of the FSIA to the pre–1952 events here in suit may not even count as "a genuinely 'retroactive' effect". *Landgraf v. USI Film Products,* —— U.S. ——, ——, 114 S.Ct. 1483, 1503, 128 L.Ed.2d 229 (1994). Only a statute that "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed" is truly retroactive. *Id.* —— U.S. at ——, 114 S.Ct. at 1505. A statute affecting jurisdiction, on the other hand, "usually 'take[s] away no substantive right but simply changes the tribunal that is to hear the case.' *Hallowell* [*v. Commons* ], 239 U.S. [506] 508, 36 S.Ct. [202] 202, [60 L.Ed. 409.] Present law normally governs in such situations because jurisdictional statutes 'speak to the power of the court rather than to the rights or obligations of the parties,' *Republic Nat. Bank of Miami,* [*v. U.S.* ] 506 U.S. [——, ——] 113 S.Ct. [554] 565 [121 L.Ed.2d 474] (Thomas, J., concurring)." *Id.* —— U.S. at ——, 114 S.Ct. at 1502. At least when one of the several

states is a defendant, an expectation of immunity from suit is not such a "right." *See United States v. Alabama,* 362 U.S. 602, 604, 80 S.Ct. 924, 926, 4 L.Ed.2d 982 (1960) (upholding district court jurisdiction over suit against state pursuant to Civil Rights Act amendment enacted after suit filed); *but see Jackson,* 794 F.2d at 1497; *Carl Marks,* 841 F.2d at 27 (before Tate Letter, foreign sovereigns had settled expectation of immunity amounting to antecedent right). Similarly, it might be argued, application of the FSIA (and particularly application of an exception set out in the FSIA) to the events at issue in this case would not alter Germany's liability under the applicable substantive law in force at the time, i.e. it would just remove the bar of sovereign immunity to the plaintiff's vindicating his rights under that law. *See Landgraf,* —— U.S. at ——, 114 S.Ct. at 1502 ("Because rules of procedure regulate secondary rather than primary conduct, the fact that a new procedural rule was instituted after the conduct giving rise to the suit does not make application of the rule at trial retroactive").

We do not have to decide whether the FSIA applies to pre–1952 events, however, in order to resolve this case. For as will be seen in Part II.B below, even if the FSIA does apply here, none of the statutory exceptions to foreign sovereign immunity applies. On the other hand, if the FSIA does not apply to Mr. Princz's claims, and even if Germany is not immune from suit under the pre-FSIA law that would apply, then as will be seen in Part II.C, a federal district court does not have jurisdiction over Mr. Princz's claims because they arise in tort and quasi contract. Mr. Princz offers no case law, and we are aware of none, suggesting that a court can revive the pre-FSIA diversity jurisdiction of § 1332 over cases brought by a United States citizen against a foreign state in order to entertain a case arising from pre-FSIA facts. In either event, therefore, the district court is without subject matter jurisdiction of the present case.

**B.** *The Foreign Sovereign Immunities Act of 1976*

■ Under the FSIA a foreign sovereign is immune from the jurisdiction of "the courts of the United States and of the States," except insofar as a particular case comes within one of the several statutory exceptions to the rule of immunity, 28 U.S.C. § 1605, or is governed by an international agreement to which the United States was a party when the FSIA was enacted. *Id.* § 1604. Mr. Princz invokes both the international agreement provision and two of the listed exceptions, viz. the exception for instances "in which the foreign state has waived its immunity either explicitly or by implication," *id.* § 1605(a)(1), and the exception for cases in which the claim arises from the foreign state's "commercial activity," as defined in the Act. *Id.* § 1605(a)(2). It is the burden of the foreign sovereign in each case to establish its immunity by demonstrating that none of the exceptions is applicable. *Transamerican S.S. Corp. v. Somali Democratic Republic,* 767 F.2d 998, 1002 (D.C.Cir. 1985).

1. The commercial activity exception.

Section 1605(a)(2) of the FSIA provides that a foreign sovereign and its agencies and instrumentalities:

shall not be immune from the jurisdiction of the courts of the United States or of the States in any case . . . in which the action is based . . . upon an act outside the territory of the United States in connection with a *commercial activity of the foreign sovereign* elsewhere and that act causes a *direct effect in the United States.*

[Emphases added.] Mr. Princz argues that the Nazi government's leasing his labor for profit to the I.G. Farben and Messerschmidt companies was commercial activity, and that it had a direct effect in the United States. Germany takes issue with both points.

a. Commercial activity.

"Commercial activity" is defined in the FSIA as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). The courts are instructed only that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or

act, rather than by reference to its purpose." *Id.* Otherwise, the FSIA leaves to the courts the "work[ing] out ... the distinction between commercial and governmental" activity. *Millen Industries, Inc. v. Coordination Council for North American Affairs,* 855 F.2d 879, 884 n. 6 (D.C.Cir.1988), quoting *Hearings on H.R. 11315 Before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary,* 94th Cong., 2d Sess. 53 (1976) (testimony of Monroe Leigh, Legal Advisor, Department of State).

As glossed by the Supreme Court, this means that in determining whether an activity is commercial, "the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'" *Republic of Argentina v. Weltover, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2160, 2166, 119 L.Ed.2d 394 (1992) (citation omitted); *Millen Industries,* 855 F.2d at 884 ("A useful inquiry ... is whether the essence or central elements of an agreement made by a foreign state 'might be made by a private person,'" quoting H.R.Rep. No. 1487, 94th Cong., 2d Sess. 16 (1976).

For its part, the government of Germany points out "that private parties do not take or hold prisoners." Mr. Princz counters that the Nazi regime "leased slaves for money to German industrial concerns who in turn utilized the slaves in commercial interests." Each of these statements is, of course, true and the question is therefore a close one, viz. whether to pierce the sovereign veil, lest the purpose of the statute be frustrated by the machinations of a rogue government that in effect leases its immunity to a private party.

As it turns out, however, we need not decide whether leasing prisoners as slave labor constitutes a commercial activity under the FSIA. For certain it is that this activity did not have a "direct effect in the United States."

b. Direct effect in the United States.

To be "direct" within the meaning of the FSIA an effect need not be "substantial" or "foreseeable" so long as it is more than "purely trivial" and "it follows 'as an immediate consequence of the defendant's ... activity.'" *Weltover,* —— U.S. at ——, 112 S.Ct. at 2168 (citation omitted). Germany here argues that the Nazis' enslavement of Mr. Princz in Poland and Germany "had no impact, much less an immediate consequence, in the United States." Mr. Princz, per contra, instances three such effects.

■ First, Mr. Princz argues that the work he was required to perform as a slave had a direct effect in this country because he worked for firms directly supporting the Nazi war effort against the United States. A "direct effect" however, "is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption." *Upton v. Empire of Iran,* 459 F.Supp. 264, 266 (D.D.C.1978), *aff'd mem.* 607 F.2d 494 (D.C.Cir.1979). Many events and actors necessarily intervened between any work that Mr. Princz performed—as a bricklayer for I.G. Farben in Poland or as a laborer in the Messerschmidt aircraft works in Germany—and any effect felt in the United States.

■ Mr. Princz's second argument is that the current government of Germany uses the mail, wire, and banking systems of the United States to administer pension and other reparation programs for the victims of the Third Reich, thereby providing the requisite "direct effect in the United States." Germany denies that it administers these programs in or from the United States. Even if it does, however, such activities, conducted years after the alleged "commercial activity" giving rise to this suit, can not be considered an "immediate consequence" of the enslavement of Mr. Princz and others. Again, there are too many intervening elements between the asserted cause and effect.

■ Finally, Mr. Princz argues that his continued suffering in the United States is a direct effect of his forced labor under the Nazi yoke. After Mr. Princz was liberated by the United States Army he spent time recuperating in a military hospital. From there he went to Czechoslovakia to search for relatives and to attend to his family's property, only after which did he move to the United States. Mr. Princz's subsequent suf-

fering was clearly an effect, but just as clearly not "a direct effect in the United States" of the Nazis' actions. Mr. Princz was enslaved in Poland and Germany; the immediate consequences of his enslavement were felt in those countries, and much time passed before Mr. Princz came to this country. *See Martin v. Republic of South Africa*, 836 F.2d 91, 95 (2d Cir.1987) (no "direct effect" where South African government allegedly caused permanent disability to American citizen who did not return to the United States until more than a year later).

■ The lingering effects of a personal injury suffered overseas can not be sufficient to satisfy the direct effect requirement of the FSIA. Otherwise, "the commercial activity exception would in large part eviscerate the FSIA's provision of immunity for foreign states." *Antares Aircraft L.P. v. Federal Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir.1993). Absent a clear indication to that effect, a court will not attribute to the Congress the intention through an exception to undermine the general grant of sovereign immunity it was ostensibly ratifying. Thus, courts applying the FSIA have uniformly rejected the argument that a personal injury suffered overseas produces a direct effect in the United States when the injured person later returns home. *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1514 (D.C.Cir. 1988) (financial and marital difficulty suffered in United States as result of Saudi Arabian government's failure to pay American employee for work performed in Saudi Arabia not a "direct effect in the United States"); *Martin v. Republic of South Africa*, 836 F.2d 91, 95 (2d Cir.1987); *Zernicek v. Brown & Root, Inc.*, 826 F.2d 415, 418–19 (5th Cir. 1987); *Australian Gov't Aircraft Factories v. Lynne*, 743 F.2d 672, 675 (9th Cir.1984); *Tucker v. Whitaker Travel, Ltd.*, 620 F.Supp. 578 (E.D.Pa.1985), *aff'd mem.*, 800 F.2d 1140 (3d Cir.1986).

We therefore hold that even if the Nazis' leasing of Mr. Princz's labor was a "commercial activity" within the meaning of the FSIA, that activity did not have a "direct effect" in the United States.

2. The waiver exception of § 1605(a)(1).

■ Not surprisingly, there is no sovereign immunity in a case "in which the foreign state has waived its immunity either explicitly or by implication," 28 U.S.C. § 1605(a)(1) (with an exception not here relevant). Here the *amici* argue that the Third Reich impliedly waived Germany's sovereign immunity under the FSIA by violating *jus cogens* norms of the law of nations. In their own words: "A foreign state that violates these fundamental requirements of a civilized world thereby waives its right to be treated as a sovereign." With respect, we do not think that the waiver exception to the FSIA can be read so broadly.

A *jus cogens* norm is a principle of international law that is "accepted by the international community of States as a whole as a norm from which no derogation is permitted...." *Committee of U.S. Citizens in Nicaragua v. Reagan*, 859 F.2d 929, 940 (D.C.Cir.1988), quoting Vienna Convention on the Law of Treaties, May 23, 1969, art. 53, U.N.Doc. A/Conf. 39/27, 8 I.L.M. 679. Such peremptory norms are "nonderogable and enjoy the highest status within international law," *Committee of U.S. Citizens in Nicaragua*, 859 F.2d at 940; they "prevail over and invalidate international agreements and other rules of international law in conflict with them," and they are "subject to modification only by a subsequent norm of international law having the same character." Restatement, *supra*, § 102 comment k.

According to one authority, a state violates *jus cogens*, as currently defined, if it:

practices, encourages, or condones (a) genocide, (b) slavery or slave trade, (c) the murder or causing the disappearance of individuals, (d) torture or other cruel, inhuman, or degrading treatment or punishment, (e) prolonged arbitrary detention, (f) systematic racial discrimination, or (g) a consistent pattern of gross violations of internationally recognized human rights.

Restatement, *supra*, § 702 and comment n. Before the Nuremburg trials, such outrages had not been expressly declared violations of the law of nations. David F. Klein, *A Theory for the Application of the Customary International Law of Human Rights by Domestic*

*Courts,* 13 Yale Journal of Int'l Law 332, 340 (1988); Fogelson, *supra* at 869. The Nuremberg Tribunal nonetheless punished Nazi officials for committing crimes against humanity:

> [The trials] for the first time made explicit and unambiguous what was theretofore, as the Tribunal has declared, implicit in International Law, namely, that to prepare, incite, or wage a war of aggression . . . and that to persecute, oppress, or do violence to individuals or minorities on political, racial, or religious grounds in connection with such a war, or to exterminate, enslave, or deport civilian populations, is an international crime.

R. Jackson, Final Report to the President on the Nuremberg Trials (Oct. 7, 1946) (*cited in* R. Jackson, The Nurnberg Case xiv–xv (1971)); *see also* Klein, *supra* at 340 and nn. 40–42; *The Nurnberg Trial,* 6 F.R.D. 69, 77–78 (1946). As the Ninth Circuit has explained:

> The universal and fundamental rights of human beings identified by Nuremberg—rights against genocide, enslavement, and other inhumane acts . . .—are the direct ancestors of the universal and fundamental norms recognized as *jus cogens.*

*Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 715 (9th Cir.1992). Indeed, it is doubtful that any state has ever violated *jus cogens* norms on a scale rivaling that of the Third Reich. *See* Steven Fogelson, *The Nuremberg Legacy: An Unfulfilled Promise,* 63 S.Cal.L.Rev. 833, 834 (1990).

The *amici* argue that interpreting the FSIA to imply a waiver where a violation of *jus cogens* norms has occurred "would reconcile the FSIA with accepted principles of international law." *Citing* Adam Belsky, *Implied Waiver Under the FSIA: A Proposed Exception to Immunity for Violations of Peremptory Norms of International Law,* 77 Cal.L.Rev. 365 (1989). Although no reported decision considers the *amici*'s specific argument that a violation of *jus cogens* norms forfeits immunity under the implied waiver provision of the FSIA, the Ninth Circuit has

stated broadly that "[t]he fact that there has been a violation of *jus cogens* does not confer jurisdiction under the FSIA." *Siderman de Blake,* 965 F.2d at 719.

Moreover, the *amici*'s *jus cogens* theory of implied waiver is incompatible with the intentionality requirement implicit in § 1605(a)(1). *See Foremost–McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 444 (D.C.Cir.1990), *quoting Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 377 (7th Cir.1985) (courts "rarely find that a nation has waived its sovereign immunity . . . 'without strong evidence that this is what the foreign state intended' "); *accord Drexel Burnham Lambert v. Committee of Receivers,* 12 F.3d 317, 326 (2d Cir.1993); *Joseph v. Office of the Consulate General,* 830 F.2d 1018, 1022 (9th Cir.1987); *Zernicek v. Petroleos Mexicanos (Pemex),* 614 F.Supp. 407, 411 (S.D.Tex.1985), *aff'd,* 826 F.2d 415 (5th Cir. 1987). That requirement is also reflected in the examples of implied waiver set forth in the legislative history of § 1605(a)(1), all of which arise either from the foreign state's agreement (to arbitration or to a particular choice of law) or from its filing a responsive pleading without raising the defense of sovereign immunity. *See* H.R.Rep. 1487, 94th Cong. 2d Sess., 18 (1976); Sen. Rep. 1310, 94th Cong. 2d Sess., 18 (1976). And as the Seventh Circuit has observed, "[s]ince the FSIA became law, courts have been reluctant to stray beyond these examples when considering claims that a nation has implicitly waived its defense of sovereign immunity." *Frolova,* 761 F.2d at 377.

In sum, an implied waiver depends upon the foreign government's having at some point indicated its amenability to suit. Mr. Princz does not maintain, however, that either the present government of Germany or the predecessor government of the Third Reich actually indicated, even implicitly, a willingness to waive immunity for actions arising out of the Nazi atrocities. We have no warrant, therefore, for holding that the violation of *jus cogens* norms by the Third Reich constitutes an implied waiver of sovereign immunity under the FSIA.[1]

---

1. Our dissenting colleague Judge Wald suggests, in effect, that because the Congress has not expressly excluded suits for the violation of *jus cogens* norms from the scope of § 1605(a)(1),

3. The treaty provision.

■ Section 1604 of the FSIA provides that a foreign sovereign's immunity from suit is "[s]ubject to existing international agreements to which the United States [was] a party at the time of the enactment of [the FSIA]." One such agreement, the Hague Convention, in turn provides that the inhabitants of an occupied country may not be required to "tak[e] part in military operations against their own country," (Article 52) and that "[a] belligerent party which violates [this prohibition] shall, if the case demands, be liable to pay compensation." (Article 3).

In the Nuremberg Trial decision the Tribunal makes official what is in any event clear, that the Nazi regime acted "in flagrant violation of the terms" of the Hague Convention, including Article 52. 6 F.R.D. 69, 123 (1946). Therefore, Mr. Princz argues, "the compensation provisions of the Hague Convention are in conflict with the FSIA's immunity provision, thus invoking its exception for prior existing treaty obligations." Binding precedent is clearly to the contrary, and clearly correct.

In *Amerada Hess,* the Supreme Court held that the treaty exception of the FSIA "applies when international agreements 'expressly conflic[t]' with the immunity provisions of the FSIA," and that an international convention that "only set[s] forth substantive rules of conduct and state[s] that compensation shall be paid for certain wrongs.... [d]o[es] not [necessarily] create private rights of action...." 488 U.S. at 442, 109 S.Ct. at 692. The cases are unanimous, however, in holding that nothing in the Hague Convention "even impliedly grants individuals the right to seek damages for violation of [its] provisions." *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 810 (D.C.Cir.1984) (Bork, J., concurring); *accord Goldstar (Panama) S.A. v. United States,* 967 F.2d 965, 968–69 (4th Cir.1992); *Dreyfus v. Von Finck,* 534 F.2d 24, 30 (2d Cir.1976); *Handel v. Artukovic,* 601 F.Supp. 1421, 1425 (C.D.Cal.1985).

For the foregoing reasons, we conclude that none of the exceptions to sovereign immunity provided in the FSIA applies to the facts alleged by Mr. Princz. Therefore, we need not decide whether the FSIA applies retroactively to this case; for Mr. Princz' suit is barred by the FSIA even if we do give retroactive effect to that Act—and more to the point, to the exceptions to sovereign immunity that it recognizes.

### C. Foreign Sovereign Immunity Under the Circuit Law of 1942–45

■ What, then, if the FSIA does not apply retroactively to bar this case? In that event, Germany argues (albeit for the first time on appeal) that it is entitled to absolute sovereign immunity under the case law of this circuit as it stood during the period 1942–45, i.e. prior to the Tate Letter and to adoption of the restrictive theory of sovereign immunity. To this end Germany cites *United States ex rel. Cardashian v. Snyder,* 44 F.2d 895 (D.C.Cir.1930) and *Matthews, United States Marshal v. Walton Rice Mill, Inc.,* 176 F.2d 69 (D.C.Cir.1949).

---

international law requires that we "construe the [FSIA] to encompass an implied waiver exception" for such suits, thus providing jurisdiction over Mr. Princz's claims. Dis. Op. at 1184–85. While it is true that "international law is a part of our law," *Paquete Habana,* 175 U.S. at 700, 20 S.Ct. at 299, it is also our law that a federal court is not competent to hear a claim arising under international law absent a statute granting such jurisdiction. Judge Wald finds that grant through a creative, not to say strained, reading of the FSIA against the background of international law itself.

We think that something more nearly express is wanted before we impute to the Congress an intention that the federal courts assume jurisdiction over the countless human rights cases that might well be brought by the victims of all the ruthless military juntas, presidents-for-life, and murderous dictators of the world, from Idi Amin to Mao Zedong. Such an expansive reading of § 1605(a)(1) would likely place an enormous strain not only upon our courts but, more to the immediate point, upon our country's diplomatic relations with any number of foreign nations. In many if not most cases the outlaw regime would no longer even be in power and our Government could have normal relations with the government of the day—unless disrupted by our courts, that is.

Like Judge Wald, we recognize that this suit may represent Mr. Princz's last hope of reparation. Still, we cannot responsibly make the inferential leap that would be required in order to provide him with the federal forum he seeks.

Because subject matter jurisdiction cannot be created by consent, waiver, or even estoppel, *Insurance Corp. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982), we would consider this belated argument if it were of any consequence to federal jurisdiction of this case. It is immaterial, however, because there is no present basis for subject matter jurisdiction over Mr. Princz's claims in the district court regardless of the state of the circuit law concerning immunity in the period 1942–1945.

Until the passage of the FSIA in 1976, 28 U.S.C. § 1332 provided for federal diversity jurisdiction over a case brought by a United States citizen against a foreign state. When the Congress passed the FSIA, however, it deleted that grant of jurisdiction from § 1332. As noted above, the House Report on the FSIA states that "[s]ince jurisdiction in actions against foreign states is comprehensively treated by the new section 1330, a similar jurisdictional basis under section 1332 becomes superfluous." H.R.Rep. No. 94–1487, 94th Cong.2d Sess., 14 (1976). New § 1330(a), in turn, asserts federal jurisdiction over a suit against a foreign state only insofar as the foreign state is not entitled to immunity under the FSIA; and as we have already held, no exception to immunity under the FSIA covers this case.

Nor is this case within the federal question jurisdiction conferred by 28 U.S.C. § 1331, because Mr. Princz's claims against Germany sound in tort and quasi contract, not in federal law. Regardless whether Germany is entitled to sovereign immunity apart from the FSIA, therefore, the district court lacks subject matter jurisdiction over Mr. Princz's claims.

### III. CONCLUSION

The district court lacks jurisdiction of Mr. Princz's claims. If the FSIA applies retroactively to the terrible events giving rise to this case, then it bars the suit, which comes within no exception in the Act. If instead the case is governed by the pre-FSIA law of sovereign immunity, then it is not within post-FSIA diversity jurisdiction of the district court. The judgment of the district court is therefore reversed and the case is

*Dismissed.*

WALD, Circuit Judge, dissenting:

The Holocaust indelibly scarred Hugo Princz. At the outbreak of World War II, Princz, a sixteen-year-old American Jew, found himself trapped in Czechoslovakia and unable to return to the United States. After America formally declared war against Germany, the Nazis seized Princz, his parents, his three brothers, and his sister as enemy aliens. The Nazis refused to exchange the family for German civilians detained by the United States as part of an International Red Cross program, instead forcibly transporting them to the Maidanek concentration camp in Poland, where Princz and two of his brothers were torn from their parents and sister. Princz believes that German officials murdered his parents and sister at the concentration camp in Treblinka; he never saw them again.[1]

In May 1942, the Nazis transported Princz and his two brothers to the concentration camp at Auschwitz. There, they stripped Princz of his personal identity—tattooing him with the number "36 707" and requiring him to wear a prisoner's uniform with "USA" stenciled on the front. The Nazis then "leased" Princz and his brothers to I.G. Farben, a German chemical cartel, which enslaved the three brothers at a facility known as Birkenau. During his two years of forced labor at Birkenau and captivity at Auschwitz, Princz was the victim of unrelenting physical, mental, and emotional abuse. After each of his brothers suffered work-related injuries, Princz was subjected to the unimaginable horror of watching officials intentionally starve them to death at the Birkenau "hospital."

---

1. At this stage, we may not question Princz's rendition of the horrors he suffered. In reviewing a motion to dismiss based in part on Federal Rule of Civil Procedure 12(b)(6), we must accept all of the plaintiff's allegations in the complaint as true. *See Moore v. Agency for Int'l Dev't,* 994 F.2d 874, 875 (D.C.Cir.1993).

Bereft of family, Princz was sent to the Warsaw Ghetto for eight months. Princz's description of the time spent in the ghetto as a "relative respite" gives some indication of the atrocities witnessed by and inflicted upon him during his prior (and subsequent) enslavement and imprisonment. But the monstrosities did not end within Warsaw's walls. In October 1944, Princz was again transferred to the immediate custody of the Nazis and forced on a death march to Dachau, where he was enslaved as a laborer in the underground Messerschmidt airplane factory. Six months later, when it became clear the Allies would win the war, the Nazis sought to eliminate all evidence of the Holocaust, including the existence of slave laborers. Forced onto a cramped cattle train headed toward a mass execution in the Alps, Princz survived only because of the intervening German surrender. After searching futilely for traces of his family, Princz eventually returned to the United States.

For decades thereafter, using the available international compensation mechanisms, Princz sought unsuccessfully to obtain reparations from Germany for both the loss of his pension and the physical and mental suffering inflicted upon him during the war. Despite its public professions of penitence for the horrors of the Holocaust, however, Germany repeatedly relied on technicalities such as Princz's citizenship at the time of his enslavement to deny him either a pension or any restitution for his immense suffering. Ironically, had Princz not been an American citizen at the time of the Holocaust, he would have received compensation.

Finally, in March 1992, Princz filed suit in a United States federal district court, basing his claims against Germany on theories of false imprisonment, assault and battery, negligent infliction of emotional distress, and intentional infliction of emotional distress. Princz sought compensatory and punitive damages, as well as the value in *quantum meruit* of his labor at the I.G. Farben and Messerschmidt plants. The district court denied Germany's motion to dismiss for lack of subject-matter jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602 *et seq.* ("FSIA" or "Act"), rul-

ing that the FSIA "has no role to play where the claims alleged involve undisputed acts of barbarism committed by a one-time outlaw nation which demonstrated callous disrespect for the humanity of an American citizen, simply because he was Jewish." *Princz v. Federal Republic of Germany,* 813 F.Supp. 22, 26 (D.D.C.1992).

After we determined that the district court's jurisdictional decision was immediately appealable, *see Princz v. Federal Republic of Germany,* 998 F.2d 1 (D.C.Cir.1993), Princz renewed his pursuit of a diplomatic remedy, and the political branches of the United States government voiced substantial support for his plight. In mid-November 1993, the United States Senate unanimously expressed its hope that President Clinton would raise the matter of reparations for Princz during his January 31, 1994 meeting with German Chancellor Helmut Kohl and "state publicly and unequivocally that the United States will not countenance the continued discriminatory treatment of Hugo Princz in light of the terrible torment he suffered at the hands of the Nazis." S.Res. 162, 103d Cong., 1st Sess. at 4 (1993). The House of Representatives overwhelmingly passed a similar resolution in late January 1994. *See* H.Res. 323, 103d Cong., 2d Sess. (1994). Nonetheless, diplomatic channels proved unavailing. When President Clinton raised the issue during the January 31, 1994 meeting, Chancellor Kohl reportedly refused to engage in any discussion of Princz while his case was pending before this court. Moreover, in a diplomatic note to the Department of State, the German government was quick to emphasize that the Chancellor's silence "is not meant to imply that out of court negotiations are contemplated at a later date." Note Verbale from the Embassy of the Federal Republic of Germany to the United States Department of State 4 (Feb. 2, 1994).

Due to Germany's unequivocal refusal to enter into any settlement with Princz, this appeal is his last resort. Contrary to my colleagues, who would deny Princz the opportunity even to present his claims in federal court, I would affirm the district court's order denying Germany's motion to dismiss on

grounds of foreign sovereign immunity. I believe that Germany's treatment of Princz violated *jus cogens* norms of the law of nations, and that by engaging in such conduct, Germany implicitly waived its immunity from suit within the meaning of § 1605(a)(1) of the FSIA. Accordingly, in my view, the federal courts have jurisdiction to entertain Princz's claims.

## I. THE FSIA APPLIES

The FSIA, enacted in 1976, is the sole means of obtaining jurisdiction over a foreign state defendant in federal court. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989). The first inquiry, therefore, is whether the FSIA applies to Princz's claims, which arose over thirty years before its enactment. While my colleagues articulate several persuasive reasons for applying the FSIA to this case, they do not decide whether it covers the heinous acts alleged here. I think that it does.

The Supreme Court has recently provided the following analytical framework for retroactivity analysis:

> [w]hen a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.

*Landgraf v. USI Film Prods.*, —— U.S. ——, ——, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994).

The language and legislative history of the FSIA provide only ambiguous guidance on the retroactivity question. The "henceforth"

language of § 1602 [2] suggests that courts addressing claims filed after the effective date of the FSIA should apply the Act regardless of whether the underlying challenged conduct occurred before or after its enactment. *See* Majority Opinion ("Maj. Op.") at 1170. Nonetheless, several courts have held that the "statutory language and legislative history of the FSIA provide no support for the retroactive application of the Act to transactions occurring before 1952," the year when the United States adopted the principle of restrictive immunity for commercial transactions. *Slade v. United States of Mexico*, 617 F.Supp. 351, 357 (D.D.C.1985), *aff'd mem. op.* 790 F.2d 163 (D.C.Cir.1986), *cert. denied*, 479 U.S. 1032, 107 S.Ct. 878, 93 L.Ed.2d 832 (1987); *accord Jackson v. People's Republic of China*, 596 F.Supp. 386, 388 (N.D.Ala.1984), *aff'd* 794 F.2d 1490, 1497 (11th Cir.1986), *cert. denied*, 480 U.S. 917, 107 S.Ct. 1371, 94 L.Ed.2d 687 (1987); *Carl Marks & Co. v. U.S.S.R.*, 665 F.Supp. 323, 336–37 (S.D.N.Y.1987), *aff'd* 841 F.2d 26 (2d Cir.), *cert. denied*, 487 U.S. 1219, 108 S.Ct. 2874, 101 L.Ed.2d 909 (1988). As evidence of the Act's prospective reach, these courts have focused on both the "henceforth" language of § 1602 and Congress' decision to delay the effective date of the FSIA for ninety days. *See Slade*, 617 F.Supp. at 357; *accord Jackson*, 596 F.Supp. at 388; *Carl Marks & Co.*, 665 F.Supp. at 336–37 (provision in § 1330(a) that district courts "shall have" jurisdiction over cases specified in §§ 1605 & 1607 indicates prospective application).

In the absence of any express congressional intent on the retroactivity issue, the next question is whether applying the FSIA would "impair rights a party possessed when he acted," *Landgraf*, —— U.S. at ——, 114 S.Ct. at 1505, *i.e.*, whether in 1942–45 Germany would have been entitled to immunity for imprisoning and enslaving Princz. Germany argues that in the 1940s our courts would not have allowed a sovereign to be sued absent its consent. The Supreme Court, however, has emphasized a different practice: deference by the courts to the case-by-case for-

---

**2.** Section 1602 provides that "[c]laims of foreign states to immunity should *henceforth* be decided by courts of the United States and the States in conformity with the principles set forth in this chapter." 28 U.S.C. § 1602 (1988) (emphasis added).

eign policy determinations of the executive branch. *See Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486, 103 S.Ct. 1962, 1967–68, 76 L.Ed.2d 81 (1983); *see, e.g., Ex Parte Peru,* 318 U.S. 578, 587–89, 63 S.Ct. 793, 799–800, 87 L.Ed. 1014 (1943) (ordering district court to relinquish *in rem* jurisdiction over Peruvian-owned vessel where Department of State recognized and allowed immunity of Peru); *Mexico v. Hoffman,* 324 U.S. 30, 36, 65 S.Ct. 530, 533, 89 L.Ed. 729 (1945) (exercising *in rem* jurisdiction in absence of State Department certification of immunity or evidence that the United States would customarily recognize immunity); *see also* Edward D. Re, *Human Rights, Domestic Courts, and Effective Remedies,* 67 St. John's L.Rev. 581, 583 (1993) (before 1952 executive branch would decide whether to espouse claims of injured citizens). As Chief Justice Stone remarked, "[i]t is ... not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize." *Hoffman,* 324 U.S. at 35, 65 S.Ct. at 533. The operative question, then, is whether the executive branch would have recommended immunity for perpetrators of the Holocaust. The intuitive answer is no.

In the mid–1940s, Germany could not, even in its wildest dreams, have expected the executive branch of the United States, as a matter of grace and comity, to suggest immunity for its enslavement and confinement (in three concentration camps) of an American citizen during the Holocaust. The outcome of the Nuremberg trials provides a clear signal that the international community, and particularly the United States—one of the four nations that established the Nuremberg Tribunal—would not have supported a broad enough immunity to shroud the atrocities committed during the Holocaust. Indeed, the Nuremberg Tribunal denied the German defendants' claims of official immunity because in the eyes of the international community Germany as a whole was owed no immunity: "[h]e who violates the laws of war cannot obtain immunity while acting in pursuance of the authority of the state if the state in authorizing action moves outside its competence under International Law." *The Nuremberg Decision,* 6 F.R.D. 69, 110 (1946). Clearly, had the question been put to them, the United States executive branch would have opted to deny Germany's claims to immunity for the crimes alleged in this case. *Cf. Bernstein v. N.V. Nederlandsche–Amerikaansche,* 210 F.2d 375, 376 (2d Cir.1954) (allowing district court to pass on validity of acts of officials of German government due to State Department letter "reliev[ing] American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials"). Accordingly, because the FSIA infringes upon no rights held by Germany at the time it enslaved and imprisoned Princz, it applies to this case. *See Bradley v. Richmond School Bd.,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974) ("a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice"). Germany would suffer no inequity from this result, but a contrary conclusion would indeed be manifestly unjust to Princz.

## II. IMPLIED WAIVER EXCEPTION TO FOREIGN SOVEREIGN IMMUNITY

The FSIA sets forth a general rule of foreign sovereign immunity followed by several exceptions. Jurisdiction lies whenever a litigant's claims fall within one of the statutory exceptions. One of these exceptions to immunity, the implied waiver exception, provides that a foreign state shall not be immune in any case in which the state "has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1) (1988). Because I believe that Germany implicitly waived its immunity by engaging in the barbaric conduct alleged in this case, I disagree with my colleagues' conclusion that none of the FSIA exceptions to foreign sovereign immunity apply.

Germany waived its sovereign immunity by violating the *jus cogens* norms of international law condemning enslavement and genocide. A *jus cogens* norm, also known as a "peremptory norm" of international law, "is a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subse-

quent norm of general international law having the same character." Vienna Convention on the Law of Treaties, May 23, 1969, art. 53, 1155 U.N.T.S. 332; *see also* 1 RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 102, cmt. k & Reporter's Note 6 (1987) [hereinafter RESTATEMENT (THIRD) ] (adopting Vienna Convention's definition of *jus cogens* ). *Jus cogens* norms are a select and narrow subset of the norms recognized as customary international law. *See Committee of United States Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 940 (D.C.Cir.1988) [hereinafter *CUSCLIN* ]. Sitting atop the hierarchy of international law, *jus cogens* norms enjoy the greatest clout, preempting both conflicting treaties and customary international law. *See* RESTATEMENT (THIRD) § 102, cmt. k (international agreements which violate *jus cogens* norms are void); *see also United States v. Alfried Krupp,* IX TRIALS OF WAR CRIMINALS BEFORE THE NUERNBERG [SIC] MILITARY TRIBUNALS UNDER CONTROL COUNCIL LAW NO. 10 at 1395 (1950) (finding agreement between Germany and France authorizing use of French prisoners of war in German armament industry void under law of nations).

One need not pause long before concluding that the international community's denunciation of both genocide and slavery are accepted norms of customary international law and, in particular, are *jus cogens* norms. The Restatement (Third) of Foreign Relations Law defines customary international law as the "general and consistent practice of states followed by them from a sense of legal obligation." 1 RESTATEMENT (THIRD) § 102(2). To ascertain customary international law, judges resort to "the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators." *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900). These same tools are used to determine whether a norm of customary international law has attained the special status of a *jus cogens* norm. *See Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 715 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993). A *jus cogens* norm exists if the international community recognizes the norm as so fundamental that it is

"nonderogable." *See CUSCLIN,* 859 F.2d at 940. While commentators may disagree on the exact scope of all *jus cogens* norms, there is universal consensus on the existence of norms against genocide and enslavement. *See, e.g., Siderman,* 965 F.2d at 715 (deeming rights against genocide and enslavement universal and fundamental); *CUSCLIN,* 859 F.2d at 942 (noting "universal disapprobation" aroused by slavery or genocide); *Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 781, 791 n. 20 (D.C.Cir.1984) (Edwards, J., concurring) (describing genocide and slavery as "heinous actions—each of which violates definable, universal and obligatory norms"), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); Convention to Suppress the Slave Trade and Slavery, Sept. 25, 1926, 46 Stat. 2183, T.S. No. 778, 60 L.N.T.S. 253 (ratified by United States); Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 7, 1948, 78 U.N.T.S. 277 (ratified by United States); *see also* 2 RESTATEMENT (THIRD) § 702(a) & (b), cmt. n (classifying norms against genocide and slavery as *jus cogens* norms); Advisory Opinion, Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide, 1951 I.C.J. 15, 23 (May 28) ("the principles underlying the [Genocide] Convention are principles which are recognized by civilized nations as binding on States, even without any conventional obligation"); Adam C. Belsky et al., *Implied Waiver Under the FSIA: A Proposed Exception to Immunity for Violations of Peremptory Norms of International Law,* 77 CAL.L.REV. 365, 389 (1989) [hereinafter *Implied Waiver* ] (concluding that prohibition of slavery and genocide falls within category of *jus cogens* norms necessary to protect minimum standards of public order). What could be more fundamental than an individual's right to be free from the infliction of cruel and sadistic terrors designed with the sole purpose of destroying the individual's psyche and person because of the national, ethnic, racial, or religious community to which he belongs? What could be more elementary than a prohibition against eviscerating a person's human dignity by thrusting him into the shackles of slavery? Germany clearly violated *jus cogens* norms by forcibly extracting labor

from Princz at the I.G. Farben and Messerschmidt factories and by subjecting him to unconscionable physical and mental abuse at the Auschwitz and Dachau concentration camps.

The international consensus endorsing the existence and force of *jus cogens* norms solidified in the aftermath of World War II. "The universal and fundamental rights of human beings identified by Nuremberg—rights against genocide, enslavement, and other inhumane acts—are the direct ancestors of the universal and fundamental norms recognized as *jus cogens.*" *Siderman*, 965 F.2d at 715 (citations omitted). After the Nuremberg war crimes trials, the General Assembly of the United Nations unanimously approved a resolution affirming "the principles of international law recognized by the Charter of the Nurnberg [sic] Tribunal and the judgment of the Tribunal." *Affirmation of the Principles of International Law Recognized in the Charter of the Nuremberg Tribunal,* G.A. Res. 95(I), U.N. GAOR, 1st Sess., at 188, U.N. Doc. A/236 (1947). One of the United States prosecutors at the Nuremberg trials described these principles, known as the "Nuremberg Principles," as "an international legal force to be reckoned with." Telford Taylor, THE ANATOMY OF THE NUREMBERG TRIALS: A PERSONAL MEMOIR 4 (1992). The Nuremberg Principles crystallized the pre-existing international condemnation of persecution and enslavement of civilians on the basis of race or religious belief, with the widescale atrocities committed by Hitler's Germany driving home the concept that certain fundamental rights may never be transgressed under international law. *See* Steven Fogelson, *The Nuremberg Legacy: An Unfulfilled Promise,* 63 S.CAL.L.REV. 833, 868 (1990); *see also Siderman,* 965 F.2d at 715 ("The legitimacy of the Nuremberg prosecutions rested not on the consent of the Axis Powers and individual defendants, but on the nature of the acts they committed: acts that the laws of all civilized nations define as criminal.").

The principle of nonderogable peremptory norms evolved due to the perception that conformance to certain fundamental principles by all states is absolutely essential to the survival of the international community. *See* Belsky, *Implied Waiver,* 77 CAL.L.REV. at 387. Were the conscience of the international community to permit derogation from these norms, ordered society as we know it would cease. Thus, to preserve the international order, states must abdicate any "right" to ignore or violate such norms. As the German Supreme Constitutional Court has explained, *jus cogens* norms are those that "are indispensable to the existence of the law of nations as an international legal order, and the observance of which can be required by *all* members of the international community." Comment, *Jus Dispositivum and Jus Cogens in International Law: In the Light of a Recent Decision of the German Supreme Constitutional Court,* 60 AM.J.INT'L L. 511, 513 (1966) (emphasis added). Unlike general rules of customary international law (*jus dispositivum*), *jus cogens* norms are binding upon all nations; where as states are not constricted by customary international law norms to which they continuously object, *jus cogens* norms do not depend on the consent of any individual state for their validity. *See* David F. Klein, *A Theory for the Application of the Customary International Law of Human Rights by Domestic Courts,* 13 YALE J. INT'L L. 332, 351 (1988) [hereinafter *Customary International Law* ]. Therefore, *jus cogens* norms have significant implications for the law of sovereign immunity, which hinges on the notion that a state's consent to suit is a necessary prerequisite to another state's exercise of jurisdiction.

To illuminate the intersection between *jus cogens* norms and the theory of foreign sovereign immunity, it is useful to begin by examining the evolution of the immunity doctrine. Granting a foreign sovereign immunity from jurisdiction has always been a matter of grace and comity, and is not required by the United States Constitution. *See Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486, 103 S.Ct. 1962, 1967–68, 76 L.Ed.2d 81 (1983). The Supreme Court first broached the question of foreign sovereign immunity in 1812, when it stated that states enjoy "exclusive and absolute" jurisdiction over their own territory. *The Schooner Exchange v. M'Faddon,* 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287 (1812). While Justice Mar-

shall's seminal opinion is most often cited for the proposition that foreign sovereigns enjoy virtually absolute immunity from suit in United States courts, *see, e.g., Verlinden,* 461 U.S. at 486, 103 S.Ct. at 1967–68, the decision in fact focused on the *exceptions* to exclusive territorial jurisdiction, which stem from a state's explicit or implicit consent to be intruded upon. *See The Schooner Exchange,* 11 U.S. (7 Cranch) at 136–42, 3 L.Ed. 287. Such consent derives from the interest in interstate relations, "which humanity dictates and its wants require." *Id.* at 136, 3 L.Ed. 287. Even in the early nineteenth century, therefore, states recognized that, to facilitate international relations, they must on occasion allow infringements on their exclusive territorial jurisdiction.

Prior to the Nuremberg trials, the positivist theory of international law governed state sovereignty, and a state's treatment of its own citizens was considered immune from the dictates of international law. *See* Anthony D'Amato, *What Does Tel–Oren Tell Lawyers? Judge Bork's Concept of the Law of Nations is Seriously Mistaken,* 79 AM. J.INT'L L. 92, 104 (1985); *see also* Diane F. Orentlicher, *Settling Accounts: The Duty to Prosecute Human Rights Violations of a Prior Regime,* 100 YALE L.J. 2537, 2555 (1991) (Nuremberg trials "represented a radical innovation in international law" because previously international law had not imposed criminal penalties on a state's treatment of its own citizens). At Nuremberg, however, the four victorious powers of World War II tried German officials for "crimes against humanity," which included "murder, extermination, enslavement, deportation, and other inhuman acts committed against any civilian population, before or during the war," even if the victims were German nationals. Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, Charter of the International Military Tribunal, Aug. 8, 1945, pt. II, art. 6, 59 Stat. 1544, 1547 ("Nuremberg Charter"). The Nuremberg trials thus permanently eroded any notion that the mantle of sovereign immunity could serve to cloak an act that constitutes a "crime against humanity," even if that act is confined within the borders of a single sovereign state.

Because the Nuremberg Charter's definition of "crimes against humanity" includes what are now termed *jus cogens* norms, a state is never entitled to immunity for any act that contravenes a *jus cogens* norm, regardless of where or against whom that act was perpetrated. The rise of *jus cogens* norms limits state sovereignty "in the sense that the 'general will' of the international community of states, and other actors, will take precedence over the individual wills of states to order their relations." Mary Ellen Turpel & Phillipe Sands, *Peremptory International Law and Sovereignty: Some Questions,* 3 CONN.J.INT'L L. 364, 365 (1988). *Jus cogens* norms are by definition nonderogable, and thus when a state thumbs its nose at such a norm, in effect overriding the collective will of the entire international community, the state cannot be performing a sovereign act entitled to immunity. When the Nazis tore off Princz's clothes, exchanged them for a prison uniform and a tattoo, shoved him behind the spiked barbed wire fences of Auschwitz and Dachau, and sold him to the German armament industry as fodder for their wartime labor operation, Germany rescinded any claim under international law to immunity from this court's jurisdiction. *See* Belsky, *Implied Waiver,* 77 CAL.L.REV. at 396.

The exercise of jurisdiction over the Nazi officials at Nuremberg was by no means a single aberration in international law. Under the principle of universal jurisdiction, for certain offenses (including, but not limited to, *jus cogens* violations) a state can exercise jurisdiction over an offender in custody even if that state has neither a territorial link to the offense nor any connection to the nationality of the victim or offender. *See* 1 RESTATEMENT (THIRD) § 404, cmt. a & Reporter's Note 1. While it is rare for a nation to exercise universal jurisdiction, Israel asserted jurisdiction under such a theory, among others, when it abducted Adolf Eichmann, the chief executioner of Hitler's "final solution," from Argentina and prosecuted him in Israel. *See Attorney General of Israel v. Eichmann,* 36 INT'L L.REP. 277 (Sup.Ct. Israel 1962). The most recent example of a prescription of jurisdiction by the interna-

tional community over *jus cogens* violations carried out within the confines of a state's own territory is the United Nations' Statute of the International War Crimes Tribunal for the former Yugoslavia ("Statute"). Enacted as a response to the appalling atrocities committed against civilians caught in the brutal conflict in the former Yugoslavia, the Statute vests the War Crimes Tribunal with jurisdiction over, *inter alia*, crimes against humanity and genocide committed in the territory of the former Yugoslavia since January 1, 1993. *See Report of the Secretary–General Pursuant to Paragraph 2 of Security Council Resolution 808*, U.N. SCOR, U.N. Doc. S/25704, art. 1, at 36 (1993). The Statute contains absolutely *no indication that foreign sovereign immunity could provide a valid defense to the exercise of the tribunal's jurisdiction.* Thus the clear import of international law is to disavow a foreign sovereign's claims to immunity where that sovereign is accused of violating universally accepted norms of conduct essential to the preservation of the international order. In other words, under international law, a state waives its right to sovereign immunity when it transgresses a *jus cogens* norm.

It is a well-established canon of statutory construction that, because "[i]nternational law is part of our law," *Paquete Habana*, 175 U.S. at 700, 20 S.Ct. at 299, we must, wherever possible, interpret United States law consistently with international law. *See The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) ("an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"); *MacLeod v. United States*, 229 U.S. 416, 434, 33 S.Ct. 955, 961, 57 L.Ed. 1260 (1913) (statutes should be construed consistently with American obligations under international law); *see also Filartiga v. Pena–Irala*, 630 F.2d 876, 887 (2d Cir.1980) (U.S. courts bound by the law of nations). Indeed, the legislative history of the FSIA indicates that Congress intended the Act to create "a

statutory regime which incorporates standards recognized under international law." H.R.REP. No. 1487, 94th Cong., 2d Sess. at 14 (1976). The only way to reconcile the FSIA's presumption of foreign sovereign immunity with international law is to interpret § 1605(a)(1) of the Act as encompassing the principle that a foreign state implicitly waives its right to sovereign immunity in United States courts by violating *jus cogens* norms.

Construing § 1605(a)(1) to include as an implied waiver a foreign state's breach of a *jus cogens* norm is not at odds with the language and legislative history of the FSIA, which supply scant guidance as to the provision's meaning. The 1976 House Report lists two examples of implicit waivers which, at the time of the Report, had been recognized by United States courts: (1) where a foreign state has agreed to arbitration in another country; and (2) where a foreign state has agreed that the law of a particular country should govern a contract. *See* H.R.REP. No. 1487, 94th Cong., 2d Sess. 18 (1976). In addition, the Judiciary Committee suggested one more example—"where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity." *Id.* This list is neither exclusive nor exhaustive, however, and courts are by no means constrained to these three examples of implied waiver. In *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 722 (9th Cir.1992), for example, the Ninth Circuit concluded that where a foreign state attempts to use the courts of the United States to facilitate the persecution of an individual, it has implicitly waived its claim to immunity from suit for such conduct.[3] *Cf. Amerada Hess*, 488 U.S. at 442–43, 109 S.Ct. at 692–93 (no waiver under § 1605(a)(1) where foreign state signed an international agreement containing no mention of a waiver of immunity to suit in the United States or even the availability of a cause of action in

---

**3.** I disagree, however, with the *Siderman* court's finding that the Supreme Court's approach in *Amerada Hess*, 488 U.S. at 436, 109 S.Ct. at 689, constrained it to hold that because the FSIA does not specifically provide for an exception to immunity when a state violates a *jus cogens* norm,

such a violation cannot confer jurisdiction under the FSIA. *Siderman*, 965 F.2d at 718–19. The Ninth Circuit failed to recognize that when a state transgresses a *jus cogens* norm, it *does* bring itself within the confines of an exception to the FSIA—the implied waiver exception.

the United States). Nothing in the legislative history of § 1605(a)(1) forecloses a finding that a state implicitly waives immunity when it transgresses one of the few universally accepted norms known as *jus cogens*.

Moreover, I disagree with my colleagues that the *"jus cogens* theory of implied waiver is incompatible with the intentionality requirement implicit in § 1605(a)(1)." Maj. Op. at 1174. The implicit intentionality requirement stems from several decisions that have limited the implied waiver exception to cases in which the foreign sovereign "contemplated" the involvement of United States courts. *See, e.g., Seetransport Wiking Trader v. Navimpex Centrala*, 989 F.2d 572, 578–79 (2d Cir.1993) (finding implicit waiver where defendant was an agency or instrumentality of a foreign state signatory to the Convention on the Recognition and Enforcement of Arbitral Awards and therefore must have contemplated enforcement actions in other signatory states, including the United States); *Siderman*, 965 F.2d at 721–22 (finding implicit waiver where foreign state defendant "not only envisioned United States court participation in its persecution of the [plaintiffs], but by its actions deliberately implicated our courts in that persecution"); *cf. Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 378 (7th Cir.1985) (no implicit waiver where no reason to conclude that foreign sovereign anticipated that international agreements to which it was a signatory would be enforced in U.S. courts). In inflicting theretofore unimaginable atrocities on innocent civilians during the Holocaust, Germany could not have helped but realize that it might one day be held accountable for its heinous actions by any other state, including the United States. *See supra* § I. The magnitude of the acts put the perpetrators on notice that they were violating "principles

common to the major legal systems of the world." *Report to the President from Robert H. Jackson, Chief Counsel for the United States in the Prosecution of Axis War Criminals, reprinted in* 39 Am.J.Int'l L. 178, 186 (Supp.1945). Adhering to such principles, now termed *jus cogens* norms,[4] is an obligation *erga omnes*—an obligation of the state toward the international community as a whole—*see Barcelona Traction Light & Power Co. (Belg. v. Spain)*, 1970 I.C.J. 4, 32 at ¶ 33 (Feb. 5), and by abdicating its responsibility to act in accordance with such norms, Germany consciously waived its right to any and all sovereign immunity.

Furthermore, a finding that Germany implicitly waived its immunity in this case is faithful to the primary rationale for the narrow construction of § 1605(a)(1)—preventing judicial interference with the notions of grace and comity that underlie the FSIA. *See Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 445 (D.C.Cir.1990); *see also Seetransport Wiking*, 989 F.2d at 577 (broad interpretation of § 1605(a)(1) would "vastly increase the jurisdiction of the federal courts over matters involving sensitive foreign relations"). An exercise of jurisdiction over a foreign state for claims of genocide and enslavement does not awaken traditional comity concerns, particularly where, as here, both of the political branches of government have voiced strong support for the plaintiff.

In the absence of any indication that Congress intended to exclude from the scope of § 1605(a)(1) the concept that a foreign state waives its immunity by breaching a peremptory norm of international law, I believe that the only way to interpret the FSIA in accordance with international law is to construe the Act to encompass an implied waiver ex-

---

4. Although the *jus cogens* terminology gained new coinage after World War II and the Nuremberg trials, at the time of the war the norms prohibiting genocide and enslavement were already universally accepted as nonderogable. *See*

Klein, *Customary International Law*, 13 Yale J. Int'l L. at 340 ("Long before Hitler came to power, the international community had been unanimous in considering acts such as those perpetrated by the Nazis to be criminal.").

ception for *jus cogens* violations. Congress did not intend to thwart the opportunity of an American victim of the Holocaust to have his claims heard by the United States judicial system. Because I cannot agree that the

FSIA requires us to slam the door in the face of Hugo Princz, I dissent.[5]

**5.** I of course hazard no opinion on the substantive validity of Germany's nonjurisdictional defenses and the ultimate availability of monetary relief for *Princz*. Because we found that the district court's finding of subject-matter jurisdiction was immediately appealable, the merits of this case are not before us.