Michael ZERNICEK, Plaintiff-Appellant,

v.

BROWN & ROOT, INC., et al., Defendants,

Petroleos Mexicanos, Defendant-Appellee.

No. 85–2663.

United States Court of Appeals, Fifth Circuit.

Sept. 11, 1987.

Charles M. Haden and J.L. Hinojosa, Houston, Tex., for plaintiff-appellant.

Douglas S. Johnston, Houston, Tex., for defendant-appellee.

ALVIN B. RUBIN, Circuit Judge:

Under the Foreign Sovereign Immunities Act (FSIA), is a foreign-government agency immune from suit in the United States if a United States citizen sustains personal injuries in that sovereign's territory while working for a United States corporation that had contracted to conduct mineral exploration activity there? The district court correctly held that the Act shields the foreign-government agency.

I.

Petroleos Mexicanos (Pemex), an agency of the government of Mexico, was conducting mineral exploration and production operations in the Bay of Campeche, a part of the Gulf of Mexico in Mexican territorial waters. Pemex wished to engage the services of Brown & Root, Inc., a corporation domiciled in Texas, but could not do so directly because Mexican law requires that governmental agencies contract with Mexican corporations. Pemex therefore engaged as its general contractor Corporacion de Construcciones de Campeche (CCC), a company organized under Mexican law.

Brown & Root owned 49% of CCC, and the remaining 51% was owned by a Mexican company wholly owned by a Mexican national. The contract between Pemex and CCC stipulated that Brown & Root would be the "designated subcontractor" for the Bay of Campeche project, and Pemex agreed to pay Brown & Root directly in U.S. dollars. The contract also provided that any disputes that might arise between Pemex and CCC would be governed by Mexican law, submitted to conciliation, and, if conciliation efforts failed, would be decided by Mexican courts. CCC's subcontract with Brown & Root, however, specified that any dispute between them would be governed by Texas law.

Brown & Root assigned Michael Zernicek, a United States citizen employee, to a tour of duty on a fleet of vessels working on the Bay of Campeche project. Radioactive materials supplied by Rayos X, a Mexican firm, were used and stored on the vessels, allegedly under Pemex's control. Zernicek contends that he was exposed to excessive doses of radiation as a result of Pemex's negligence. Zernicek eventually returned to the United States, where he now resides. He filed suit against Pemex, Rayos X, CCC, and Brown & Root in the United States District Court for the Southern District of Texas, seeking damages and contending that he is still suffering from the effects of his exposure. Zernicek subsequently settled his claims against Brown & Root and CCC. In a reported opinion, the district court upheld Pemex's defense of sovereign immunity and dismissed Zernicek's claims against Pemex.[1]

## II.

For more than a century and a half, the United States generally granted foreign sovereigns complete immunity from suit in its courts.[2] Because foreign-sovereign immunity is a matter of grace and comity under international law, and not a restriction imposed by the Constitution, courts deferred to the decisions of the political branches, according immunity when requested by the Executive branch through the State Department.[3]

The State Department ordinarily requested immunity for friendly foreign sovereigns. Then, in 1952, in a letter written by Jack B. Tate, Acting Legal Adviser in the Department of State, to the Acting Attorney General,[4] the State Department announced that it was adopting a "restrictive" theory of foreign sovereign immunity. The shield would extend to suits involving the foreign government's public acts but not to suits in connection with a foreign state's strictly commercial acts. Pursuant to this policy, the State Department made "suggestions of immunity" to the courts. Consequently, foreign nations "often placed diplomatic pressure on the State Department," and political considerations led to immunity in cases in which it would have been unavailable under the restrictive theory.[5] If, as was sometimes the case, the foreign nation did not seek the assistance of the State Department, the courts had the responsibility for determining immunity. Thus, as the Supreme Court said in *Verlinden B.V. v. Central Bank of Nigeria,*[6] "sovereign immunity determinations were made in two different branches, subject to a variety of factors, sometimes including diplomatic considerations. Not surprisingly, the governing standards were neither clear nor uniformly applied."

1. *Zernicek v. Petroleos Mexicanos (Pemex),* 614 F.Supp. 407 (S.D. Tex. 1985).

2. *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 486, 103 S.Ct. 1962, 1967, 76 L.Ed.2d 81 (1983).

3. *See id.* at 486, 103 S.Ct. at 1967–68.

4. 26 Dept. of State Bull. 984 (1952), *reprinted in Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 711–15, 96 S.Ct. 1854, 1869–71, 48 L.Ed.2d 301 (1976).

5. *Verlinden,* 461 U.S. at 487, 103 S.Ct. at 1968 (citing Testimony of Monroe Leigh, Legal Adviser, Department of State, Hearings on H.R. 11315 before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary, 94th Cong., 2d Sess. 34–35 (1976)).

6. 461 U.S. 480, 488, 103 S.Ct. 1962, 1968, 76 L.Ed.2d 81 (1983).

In 1976, Congress enacted the FSIA to provide a comprehensive scheme governing "when and how parties can maintain a lawsuit against a foreign state or its entities in the courts of the United States."[7] The government would thus be freed from case-by-case diplomatic pressures, and litigants would be assured that decisions would be made "on purely legal grounds and under procedures that insure due process."[8]

The Act declares that "[u]nder international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned."[9] After defining "foreign state" to include agencies or instrumentalities of the state,[10] the Act declares foreign states "immune from the jurisdiction of the courts of the United States and of the States except" as it provides.[11] While the Act contains numerous exceptions, Zernicek relies on only two: The first is the commercial activities exception which denies immunity in "any case ... in which the action is based ... upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."[12] The second is the waiver provision, denying immunity whenever the foreign state "has waived its immunity either explicitly or by implication."[13]

### III.

Pemex concedes that its activities were commercial, and Zernicek concedes that Pemex is an agency of the government of Mexico. We focus, therefore, on the question whether the physical suffering and substantial medical expense to which Zernicek was subjected after he returned to the States constituted a "direct effect in the United States."

The House Report on the Act stated that the direct-effects clause would subject the foreign sovereign to United States jurisdiction consistent with principles set forth in § 18 of the Restatement (Second) of Foreign Relations Law of the United States.[14] Section 18, which is entitled "Jurisdiction to Prescribe with Respect to Effect within Territory," requires the conduct abroad to cause an effect in the U.S. that is "substantial" and "occurs as a direct and foreseeable result of the conduct outside the territory." This requirement, however, does not on its face relate to sovereign immunity but rather concerns the extent to which a state may enact substantive rules of law governing conduct outside its territory that has effects within its territory. Although the concern evidenced by § 18 is therefore legislative rather than judicial, the congressional reference to it has led most courts to find guidance in its requirements in interpreting the FSIA.[15]

---

7. H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 6 (1976), *reprinted in* 1976 U.S. Code Cong. & Admin. News 6604, 6604 [hereinafter H.R.Rep. No. 94–1487].

8. *Id.* at 7, 1976 U.S. Code Cong. & Admin. News at 6606.

9. 28 U.S.C. § 1602 (1982).

10. *Id.* § 1603(a).

11. *Id.* § 1604.

12. *Id.* § 1605(a)(2) (clause 3).

13. *Id.* § 1605(a)(1).

14. H.R.Rep. No. 94–1487, *supra*, at 19, 1976 U.S. Code Cong. & Admin. News at 6618.

15. *See Transamerican S.S. Corp. v. Somali Democratic Republic,* 767 F.2d 998, 1004 (D.C.Cir. 1985); *Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1111 & n. 9 (5th Cir.1985); *Berkovitz v. Islamic*

*Republic of Iran,* 735 F.2d 329, 332 (9th Cir.), *cert. denied,* 469 U.S. 1035, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984); *Maritime Int'l Nominees v. Republic of Guinea,* 693 F.2d 1094, 1110–11 (D.C. Cir.1982), *cert. denied,* 464 U.S. 815, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983); *Ohntrup v. Firearms Center Inc.,* 516 F.Supp. 1281, 1286 (E.D. Pa.1981), *aff'd mem.,* 760 F.2d 259 (3d Cir.1985); *Chicago Bridge & Iron Co. v. Islamic Republic of Iran,* 506 F.Supp. 981, 989 (N.D.Ill.1980); *Verlinden B.V. v. Central Bank of Nigeria,* 488 F.Supp. 1284, 1298 & n. 66 (S.D.N.Y. 1980), *aff'd,* 647 F.2d 320 (2d Cir.1981), *rev'd on other grounds,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); *Harris v. VAO Intourist, Moscow,* 481 F.Supp. 1056, 1062–63 (E.D.N.Y.1979); *see also* Note, *Direct Effect Jurisdiction Under the Foreign Sovereign Immunities Act of 1976,* 13 N.Y. U.J. Int'l L. & Pol. 571, 608–10 (1981). *But see Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 311 & n. 32 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982); Note, *Effects Juris-*

The direct-effects clause in the FSIA differs from "direct-effect" clauses found in many state long-arm statutes, because the FSIA clause is explicitly intended to encompass effects resulting from commercial as well as tortious activities.[16] The "substantial" and "direct and foreseeable" standards set forth in § 18 of the Restatement are likewise intended to apply in commercial contexts.[17]

Every court that has considered a claim for personal injury sustained in foreign territory has held that subsequent physical suffering and consequential damages are insufficient to constitute a "direct effect in the United States" for purposes of abrogating sovereign immunity. In *Sugarman v. Aeromexico, Inc.*,[18] the Third Circuit considered a suit against a Mexican government-owned airline for injuries suffered by a U.S. citizen during a trip to Mexico. While the court found that Aeromexico was not immune because the claim was "based upon a commercial activity carried on [by it] in the United States[19]—another exception to immunity[20]—it also held that causing injury to a U.S. citizen while that person is abroad is "not a direct enough effect" in the United States.[21]

Similarly, in *Upton v. Empire of Iran*,[22] the United States District Court for the District of Columbia held that the continuing effect in the United States of an injury caused to a U.S. citizen by the collapse of the roof of an airport in Tehran, Iran was not the kind of direct effect required by the Act. And the Ninth Circuit held, in *Berkovitz v. Islamic Republic of Iran*,[23] that, even if the activity of an Iranian agency charged with murdering a U.S. citizen in Iran was commercial, the "direct effect" of his death was in Iran, not in the loss that his survivors suffered in the United States.[24]

Zernicek contends that the courts have drawn an unjustifiable distinction between injuries suffered by individuals and corporations. He relies on decisions holding that a purely economic injury to a United States corporation, resulting from its activities abroad, constitutes a direct effect in the U.S. These cases simply do not make such a corporate-individual distinction.

In *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*,[25] a corporate-injury case, the Second Circuit said that the personal injury cases provide a "paradigm of 'direct.'" The injuries to those persons were "undoubtedly ... 'direct' effects."[26] It did not then distinguish corporations, although it stated, "Applying the term to a corporation is not so simple."[27] A corporation sustains a direct injury when it suffers a financial loss. It does not follow, however, that such an injury is necessarily "in the United States." In *Texas Trading*, a sufficient nexus was found between the injury and the United States because of two factors: The injured

*diction Under the Foreign Sovereign Immunities Act and the Due Process Clause*, 55 N.Y.U.L. Rev. 474, 502–05 (1980).

**16.** *Maritime Int'l Nominees*, 693 F.2d at 1111; *see also Texas Trading*, 647 F.2d at 311; H.R. Rep. No. 94–1487, *supra*, at 19, 1976 U.S. Code Cong. & Admin. News at 6618.

**17.** *See* Restatement (Second) of Foreign Relations Law of the United States § 18 comment f (1965).

**18.** 626 F.2d 270 (3d Cir.1980).

**19.** *Id.* at 272.

**20.** 28 U.S.C. § 1605(a)(2) (clause 1) (1982).

**21.** *Sugarman*, 626 F.2d at 272. *Accord Tucker v. Whitaker Travel, Ltd.*, 620 F.Supp. 578, 586 (E.D. Pa.1985), *aff'd mem.*, 800 F.2d 1140 (3d Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 578, 93

L.Ed.2d 581 (1986); *Close v. American Airlines, Inc.*, 587 F.Supp. 1062, 1064–65 (S.D.N.Y.1984).

**22.** 459 F.Supp. 264, 266 (D.D.C.1978), *aff'd mem.*, 607 F.2d 494 (D.C.Cir.1979).

**23.** 735 F.2d 329 (9th Cir.), *cert. denied*, 469 U.S. 1035, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984).

**24.** *Id.* at 332. *Accord Australian Gov't Aircraft Factories v. Lynne*, 743 F.2d 672, 674–75 (9th Cir.1984), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1189, 84 L.Ed.2d 335 (1985); *Harris*, 481 F.Supp. at 1065; *see also Verlinden*, 488 F.Supp. at 1298.

**25.** 647 F.2d 300 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).

**26.** *Id.* at 312.

**27.** *Id.*

corporation was to present documents and collect money in the U.S., and the plaintiff was an American corporation.

This court has applied the same standard for "direct effects in the United States" to both personal injury and financial loss cases. In *Callejo v. Bancomer, S.A.,* [28] we found that a Mexican government-owned bank's breach of a contract with U.S. citizens to repay deposits in dollars instead of pesos did have a "substantial effect" in the U.S. as a "direct and foreseeable result" of conduct outside the U.S.[29] The bank had been well aware that it was dealing with U.S. citizen-investors, had carried on a course of business with them while they were located in the U.S., had telephoned them and mailed certificates of deposit to them here, and had paid interest and principal to them through Texas correspondent banks. The court relied on cases involving financial injury to corporations, and carefully distinguished situations where an American was injured abroad, because in those instances the "effects in the United States ... were not direct and foreseeable." [30] In contrast, the breach of contract in *Callejo* "was closely and foreseeably tied to the effects felt by the [plaintiffs] in the United States." [31]

Indeed, drawing exactly the opposite conclusion from the breach-of-contract and corporate-injury cases, one writer has complained that courts have been more stringent in applying the direct effects test to financial injury resulting from the breach of a commercial obligation than in personal injury cases.[32]

■ Congress' use of the term "direct" in the Act was obviously intended to invoke the court's judgment. The distinction between an effect that is "direct" and one that is indirect is not quantitative and can-not be programmed into a computer. The district court properly followed the cases holding that the eventual effect in the United States of the personal injury or death of an American citizen while abroad is not direct within the meaning of the Act even if the foreign government agency might foresee that a United States citizen might be injured while travelling or working in its territory.

## IV.

■ The district court also found that Pemex had not impliedly waived its immunity. Although Pemex not only agreed, but virtually required, that CCC subcontract with Brown & Root, the contract between Pemex and CCC states that it is subject only to the jurisdiction of Mexican courts. This contract does not incorporate the terms of the subcontract by reference, and therefore does not incorporate the provision in the subcontract calling for adjudication by American courts. Pemex is not a party to the subcontract. CCC, though it is a party to the subcontract, is 51% owned by a Mexican national and not by Pemex. CCC is in fact more closely affiliated with Brown & Root, through that corporation's 49% ownership, than it is with Pemex. The cases cited by Zernicek about "strawman" corporations [33] are therefore inapposite, for their application would require a confusion of identity between Pemex and CCC. Moreover, as the district court pointed out, Pemex does not appear to have entered the contract with CCC merely for the purpose of avoiding U.S. jurisdiction. It did so to comply with Mexican law. And Mexican nationals employed directly by CCC were working on the Bay of Campeche project.

Zernicek relies on a footnote about implicit waiver in *Proyecfin de Venezuela,*

28. 764 F.2d 1101 (5th Cir.1985).

29. *Id.* at 1111.

30. *Id.*

31. *Id.* at 1112.

32. Note, *Effects Jurisdiction Under the Foreign Sovereign Immunities Act and the Due Process Clause,* 55 N.Y.U.L.Rev. 474, 474–75 (1980).

33. *See First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,* 462 U.S. 611, 628–30, 103 S.Ct. 2591, 2601–02, 77 L.Ed.2d 46 (1983); *Anderson v. Abbott,* 321 U.S. 349, 362–63, 64 S.Ct. 531, 538, 88 L.Ed. 793 (1944); *Edwards Co. v. Monogram Indus., Inc.,* 713 F.2d 139 (5th Cir.1983), *rev'd on other grounds,* 730 F.2d 977 (5th Cir.1984) (en banc).

**420**

*S.A. v. Banco Industrial de Venezuela, S.A.,* [34] asserting it to mean that, when contracts are interdependent, have common signatories, and are made in close temporal proximity, each of them incorporates the other's waiver of immunity provisions by implication. A crucial difference in the facts of *Proyecfin,* however, is that the agency of the foreign state was a signatory to the contract waiving immunity and agreeing to litigation outside of its domicile. In contrast, the only contract signed by Pemex expressly provided that the law of its domicile would apply and the courts of its domicile would have exclusive jurisdiction over disputes to which Pemex might be a party. *Proyecfin* is an explicit waiver case that has no application here.

Neither does the language of the cited footnote support Zernicek's claim. The footnote merely refers to Congress' intent that waiver be recognized in cases where a foreign state "has agreed to arbitration in another country or ... has agreed that the law of a particular country should govern a contract." [35] The Pemex-CCC contract provided precisely the opposite.

For these reasons, we AFFIRM the judgment of the district court.

**34.** 760 F.2d 390, 393 n. 2 (2d Cir.1985).

**35.** H.R.Rep. No. 94–1487, *supra,* at 18, 1976 U.S. Code Cong. & Admin. News at 6617.