**VIRTUAL COUNTRIES,
INC., Plaintiff,**

v.

**REPUBLIC OF SOUTH AFRICA, a Foreign State and South African Tourism Board, an Agency or Instrumentality of a Foreign State, Defendants.**

No. 00 Civ. 8448(AGS).

United States District Court,
S.D. New York.

June 18, 2001.

Maxim H. Waldbaum, Salans, Hertzfeld, Heilbronn, Christy & Viener, New York City, for plaintiff.

David B. Goldstein, Rabinowitz, Baoudin, Standard, Krinsky & Lieberman, P.C., New York City, Terry Gross, Gross & Belsky LLP, San Francisco, CA, for defendants.

## *MEMORANDUM ORDER*

SCHWARTZ, District Judge.

In this action, plaintiff seeks a declaration, pursuant to 28 U.S.C. § 2201, that it has the right to the Internet domain name *southafrica.com,* and an injunction preventing defendants from seeking a declaration of their rights in the name in arbitral or court proceedings worldwide. Currently before the Court is defendants' motion to stay or dismiss the action in its entirety. Because the Court finds that it lacks subject matter jurisdiction to hear the action under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602–10, the action is dismissed.

### I. Factual Background

Plaintiff Virtual Countries, Inc. ("Virtual"), a corporation organized and existing under the laws of the State of Washington with its principal place of business in Seattle, Washington, manages country-specific dot-com Internet domain names.[1]

---

1. "[A] domain name consists of a second-level domain, freely selected by the individual reg-

(Amended Complaint ("Amend.Compl.") ¶ 6.) One of the domain names that Virtual has registered is *southafrica.com*, which it has "owned and maintained" since May 13, 1995 and has used in commerce since October 1996.[2] (*Id.* ¶¶ 12, 17, 18.) Defendant Republic of South Africa ("Republic") is a foreign state, and defendant South African Tourism Board ("SATOUR") is an agency or instrumentality of Republic with its principal place of business in New York, New York. (*Id.* ¶¶ 7–8.)

The two primary international organizations that set policy concerning domain name registration principles and procedures are the Internet Corporation for Assigned Names and Numbers ("ICANN") and the World Intellectual Property Organization ("WIPO"). (Defendants' Memorandum of Law in Support of Defendants' Motion for a Stay or to Dismiss ("Def.Mem.") at 3.) ICANN was formed in 1998 by a broad coalition of Internet stakeholders, and is responsible for setting policy for and administering the assignment of domain names, including the so-called generic top-level domains ("gTLDs") .com, .net. and .org. (The Internet Corporation for Assigned Names and Numbers, http://www.icann.org, (Declaration of David B. Goldstein dated Apr. 30, 2001 ("Goldstein Decl."), Ex. 1.) It is also responsible for resolution of Internet domain name conflicts. ICANN makes decisions through its Board of Directors, who are elected from several supporting organizations, and who are advised by several committees. (Def. Mem. at 4; About ICANN, http://www.icann.org/general/abouticann.htm; ICANN: A Structural Overview, Declaration of Lora A. Moffatt, Esq. in Opposition to Defendants' Motion to Stay or Dismiss and in Support of Plaintiff's Motion for Summary Judgment ("Moffatt Decl."), Ex. C.) One such committee is the Governmental Advisory Committee ("ICANN–GAC"), the membership of which is limited to national governments, multinational government organizations and treaty organizations, and certain "distinct economies" recognized in international forums. (*Id.;* ICANN Government Advisory Committee (GAC) Home Page, http://www.noie.gov.au/projects/international/DNS/ gac/index.htm, Ex. 2 to Goldstein Decl.). Republic is a member of ICANN–GAC. (Def. Mem. at 4.) WIPO is a specialized agency of the United Nations which, *inter alia*, administers 21 international treaties concerning intellectual property protection. Its membership, like that of the United Nations, is limited to national governments, and the organization currently has 177 members, including Republic. (Def. Mem. at 4 n. 2; "The Recognition of Rights and the Use of Names in the Internet Domain Name " Interim Report of the Second WIPO Internet Domain Name Process ("Interim Report"), Ex. 7 to Goldstein Decl.) WIPO also plays a significant role in the development of Internet domain name policy, in particular by preparing reports and recommendations based upon submissions of its members and commentary by private sector members of the Internet community. (Def. Mem. at 4); Marcelo Halpern & Ajay K. Mehrotra, *From International*

istering the name, followed by a top-level domain, such as '.com,' '.net,' or '.org'." *TCPIP Holding Co., Inc. v. Haar Communications, Inc.*, 244 F.3d 88, 91 n. 3 (2d Cir.2001).

2. Virtual's network also includes, *inter alia*, *algeria.com, bangladesh.com, belgium.com, ecuador.com, morocco.com, newzealand.com, nepal.com, nicaragua.com, puertorico.com, russia.com, scotland.com, sweden.com, turkey.com,* and *ukraine.com.* (Declaration of Gregory Paley In Opposition to Defendants' Motion to Stay or Dismiss and In Support of Plaintiff's Motion for Summary Judgment dated May 4, 2001 ("Paley Decl.") ¶ 4.)

*Treaties To Internet Norms: The Evolution of International Trademark Disputes in the Internet Age,* 21 U. Pa. J. Int'l Econ. L. 523, 550–52 (2000) (describing WIPO's role in the development of ICANN's domain name policy.)

The current international procedure for domain name dispute resolution occurs through ICANN's Uniform Domain Name Dispute Resolution Policy ("UDRP"), which entered into operation on December 1, 1999.[3] (Interim Report at 1; UDRP, Ex. 3 to Goldstein Decl.) This procedure, which was developed by WIPO through the "First WIPO Internet Domain Name Process" ("WIPO–1"), is limited to the abusive registration of domain names in violation of trademark rights, which most commonly encompasses what many courts have referred to as "cybersquatting." (Interim Report at (v)); *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.,* 202 F.3d 489, 493 (2d Cir.2000) (discussing the practice of "cybersquatting"). However, WIPO left room for amendments. In the WIPO–1 Final Report, for example, WIPO discussed the issue of "geographical indications," which it stated comprise "a class of intellectual property identifiers other than trade or service marks [that are] also frequently the target of abusive cybersquatting practices," and including geographical terms such as country names. (Interim Report ¶¶ 187–91.) WIPO recommended that such issue be considered in future discussions. (*Id.* ¶ 188.)

Discussions are now underway in WIPO, as part of a second WIPO investigatory process, the WIPO–2 process, concerning possible amendments to the UDRP. In response to a demand by WIPO Member States that the organization address the issue of geographical names, WIPO–2 "requested comments on whether and by which means geographical indications (in the broad sense) should be protected against their bad faith, abusive, misleading or unfair registration or use as domain names." (*Id.* ¶ 189, Executive Summary ¶ 3.) Republic submitted a formal Comment in March 2001, in which it stated that WIPO should recommend, *inter alia,* a *per se* exclusion on the registration of country names in the second-level domain, and (ii) the adoption of a policy subjecting entities that register country names in the second-level domain to binding arbitration. (Submission by Republic of South Africa in Response to WIPO–2 RFC–2, Declaration of Andile Abner Ngcaba dated Apr. 26, 2001 ("Ngcaba Decl."), Ex. 1, at 5.) Republic has tabled similar proposals in submissions to ICANN–GAC, the Ministerial Oversight Committee of the African Telecommunications Union, and a task force of the G–8 nations addressing issues related to the so-called "digital divide" between developed and developing nations. (*Id.* ¶ 5, Exs. 2–3.)

WIPO published the WIPO–2 Interim Report in April 2001. (*See* Interim Report.) In a section entitled "Geographic Designations Beyond Intellectual Property," WIPO discusses certain issues raised by a country's attempt to claim ownership of domain names that employ the country's name.[4] (*Id.* ¶¶ 236–86.) The Report

---

3. Four dispute resolution service providers have been accredited to administer disputes under the procedure, the principal one of which is WIPO's Arbitration and Mediation Center. (Interim Report at 1) (noting that of the 3640 decisions rendered through the UDRP, 2316 have been administered by WIPO).

4. In the Report, WIPO sets forth the rationale for prompt consideration of the place of geographical terms within the domain name system, namely: (i) the "widespread practice" of registering domain names corresponding to geographical terms by entities which do not have any connection, or only a loose connection, with the geographical region, locality or

states that WIPO "favor[s] the view that a system of *per se* exclusions would *not* be a desirable means of protecting names of countries...." (*Id.* ¶ 279.) (emphasis added). WIPO's principal concern is that "such strong form of protection might be perceived to lack international legitimacy, in light of the absence of a universally accepted right of countries to the exclusive use of the terms in question in the context of the [Domain Name System]." (*Id.*) As an alternative, WIPO suggests two other options for further consideration and comment: (i) maintenance of the status quo, with no protective measures for registration of country names through the UDRP; and (ii) permitting countries, through arbitration, to seek to obtain the transfer or cancellation of the name of a country, region, or municipality which is found to be abusive. The Report does not indicate whether the arbitration proposed in the second option would be binding.[5] (*Id.* ¶¶ 281, 282.) Like WIPO–1, the WIPO–2 process will culminate with the release of a Final Report, expected in August 2001, which will constitute WIPO's recommendations to ICANN concerning domain name registration policy. (Timetable, Ex. 6 to Golstein Decl.) WIPO's conclusions are merely recommendations: ICANN and individual WIPO member states will be free to adopt or disregard the conclusions reached in the Final Report and will not be bound by its recommendations. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Stay or Dismiss ("Pl.Mem.") at 5.) Although defendants state that ICANN will consider the recommendations in the Final Report "by the end of [2001] or early next year," the record does not reflect that ICANN has set a timetable for taking action. (Def. Mem. at 7; Pl. Mem. at 5.)

This action arises out of a press release issued by Republic's Department of Communications on October 30, 2000 (the "Press Release"). In the Release, Republic stated its position, also reflected in its submissions to WIPO and ICANN–GAC, that "countries ha[ve] the first right to own their domain names." (Press Release, South African Department of Communications, South Africa Seeks to Secure *www.southafrica.com* (Oct. 30, 2000), Ex. 4 to Ngcaba Decl.) Republic further stated that it intended to file an application with WIPO by November 10, 200 asserting its rights in the *southafrica.com* domain, which it intended to use as a strategic marketing tool in promoting trade and tourism, and in promoting the image of Republic internationally. (*Id.* at 1.) Republic's then-upcoming submissions to WIPO and ICANN–GAC were also mentioned. (*Id.* at 2.) The Release stated that Republic "could be the first country in the world to make a challenge for the right to own its own domain name in the largest of the high-level domain names—dot.com."[6] (*Id.* at 1.)

concept denoted by the domain name; (ii) the impending entry into operation of certain new gTLDs, which raises the question whether registration practices should be changed for such domains, which question is currently being debated in forums such as ICANN–GAC; and (iii) the fact that new countries and people are now rapidly becoming more fully engaged in the domain name system and the debate surrounding the use of names therein, as a result of the growing use of the Internet in the regions concerned and the consequent "internationalization" of the medium. (Interim Report ¶ 237.)

5. While the Report focuses its discussion on the new gTLDs that ICANN has proposed, it states that the recommendations contained therein should also be considered in relation to the existing gTLDs, such as .com, .net, and .org. (Interim Report ¶ 286.)

6. Virtual has submitted six news articles that were published subsequent to the issuance of the Release, which explored the issues raised

Four days later, on November 3, 2000, Virtual filed the instant action, asserting that "Republic's announced intention to litigate and its assertion of rights have injured [Virtual], placing a cloud over [Virtual] in the equity markets by contesting the ownership of [Virtual's] underlying assets." (Amend.Compl.¶ 28.) Virtual requests a(i) declaration that it has the sole right in the *southafrica.com* domain, to the exclusion of defendants, and (ii) an order enjoining defendants from seeking a declaration of their rights to register the domain name in arbitral or court proceedings worldwide. (*Id.* at 9.) Although Republic's submissions reflect that it still seeks to establish a country's right to second-level domains bearing the country's name, including Republic's own rights in the *southafrica.com* name, Republic has not filed an application with WIPO, and maintains that it does not intend to do so under current UDRP procedures. (Ngcaba Decl. ¶ 8.) Defendants now move to: (i) stay the proceeding pursuant to Fed.R.Civ.P. 7(b) or the Court's inherent power, or (ii) dismiss the action in its entirety, pursuant to Fed.R.Civ.P. 12(b)(1) ("Rule 12(b)(1)"), for lack of subject matter jurisdiction under the FSIA and the Declaratory Judgment Act, 28 U.S.C. § 2201, and/or (iii) dismiss the action as to SATOUR pursuant to Fed. R.Civ.P. 12(b)(6) ("Rule 12(b)(6)").

## II. Discussion

### A. Defendants are Immune from Suit Under the FSIA

#### 1. Motion to Dismiss Standard

■ On a Rule 12 motion to dismiss, the Court must accept the factual allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (noting that factual allegations in complaint must be accepted as true on motion to dismiss); *Press v. Quick & Reilly, Inc.,* 218 F.3d 121, 128 (2d Cir.2000) (same). On a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, the court may resolve jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits and documentary exhibits. *See Zappia Middle East Constr. Co. Ltd. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir.2000) (citing *Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1019 (2d Cir.1993)).

#### 2. Commercial Activity Exception to the FSIA

■ "The Foreign Sovereign Immunities Act 'provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country.'" *Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 443, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989)). The term "foreign state" includes an agency or instrumentality of a foreign state; thus, both South Africa and SATOUR qualify as foreign states under the statute.[7] *See* 28 U.S.C. §§ 1603(a), (b); *see Hansen v. Danish*

---

by its contents as well as the nature of the instant action after it was filed. Only one of such articles appears to be from a source located in the United States. (Ex. I to Moffatt Aff.)

7. Virtual's allegations as to SATOUR are considered further in Part II.C, *infra.*

*Tourist Board*, 147 F.Supp.2d 142, 148 (E.D.N.Y.2001); (Amend.Compl.¶ 8); (*cf.* Pl. Mem. at 1 n. 1) (asserting that SATOUR "has no identity apart from Republic"); Def. Mem. at 18 n. 11 (stating that SATOUR, as a "duly created instrumentality" of a foreign state, is not necessarily its alter ego.) A foreign state is presumptively immune from the jurisdiction of United States courts under the FSIA, unless a specified exception applies. *Nelson*, 507 U.S. at 355, 113 S.Ct. 1471 (citing *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488–89, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)); *see* 28 U.S.C. § 1604. The most significant of the FSIA's exceptions, and the one at issue in this case, is the so-called "commercial activity" exception, codified in 28 U.S.C. § 1605(a)(2) ("Section 1605(a)(2)"), which provides that a foreign state is not immune from suit in any case

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

Section 1605(a)(2); *see Republic of Argentina v. Weltover*, 504 U.S. 607, 610, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992).

In this case, Virtual claims that jurisdiction lies under the third clause of Section 1605(a)(2). Therefore, this Court's analysis is limited to considering whether the lawsuit is (i) "based ... upon an act [of Republic] outside the territory of the United States"; (ii) that was taken "in connection with a commercial activity" of Republic outside this country; and (iii) that "cause[d] a direct effect in the United

States." *Weltover*, 504 U.S. at 610, 112 S.Ct. 2160. The Supreme Court has stated that the phrase "based upon," as it is used in the FSIA, "is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Nelson*, 507 U.S. at 357, 113 S.Ct. 1471. It is undisputed that this action is based upon an "act" of Republic that occurred outside the United States. Specifically, Virtual states that "[t]his action arises from, and is based upon, [Republic's] public challenge of [Virtual's] ownership of *southafrica.com* and the accompanying threat by [Republic] to commence an arbitration against [Virtual]." (Pl. Mem. at 16.) Virtual's requests for a declaratory judgment and injunction flow directly from this conduct, which Virtual acknowledges is the only "legally significant conduct" in support of its application to this Court. (*Id.* at 19.)

■ The principal disagreement between the parties pertains to whether such acts were taken "in connection with a commercial activity" of Republic, and whether the acts had a "direct effect in the United States." The record reflects that both questions should be resolved in the negative. While the FSIA provides that the commercial character of an activity should be determined by reference to its "nature," rather than the foreign state's underlying "purpose" for so acting, 28 U.S.C. § 1603(d), "[t]his definition ... leaves the critical term 'commercial' largely undefined." *Weltover*, 504 U.S. at 612, 112 S.Ct. 2160. In *Weltover*, the Supreme Court set forth the standard pursuant to which the existence of commercial activity should be judged, which standard reflects the "restrictive" theory of foreign sovereign immunity first endorsed by the State Department in 1952. *Id.; see* 26 Dept. State Bull. 984 (1952) (stating that "the purpose of the restrictive theory of sover-

eign immunity is to try to accommodate the interest of individuals doing business with foreign governments in having their legal rights determined by the courts, with the interest of foreign governments in being free to perform certain political acts without undergoing the embarrassment or hindrance of defending the propriety of such acts before foreign courts"). Under such theory, a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts (*jure imperii*), but not as to those that are private or commercial in character (*jure gestionis*). *Nelson*, 507 U.S. at 359–60, 113 S.Ct. 1471 (citations omitted). Put differently, a foreign sovereign's acts are "commercial" within the meaning of the FSIA when the sovereign "acts, not as a regulator of a market, but in the manner of a private player within it." *Weltover*, 504 U.S. at 614, 112 S.Ct. 2160. A sovereign may be considered such a private player if the particular actions it performs are "the type of actions by which a private party engages in '*trade and traffic and commerce.*'" *Id.* (emphasis added) (citations omitted); *see also* Restatement (Third) of the Foreign Relations Law of the United States § 451 (1987) ("Under international law, a state or state instrumentality is immune from the jurisdiction of the courts of another state, except with respect to claims arising out of activities of the kind that may be carried on by private persons."). Further, acts of a sovereign are "in connection with" a commercial activity when there is a substantive connection or a causal link between the acts and the commercial activity. *Hanil Bank v. Pt. Bank Negara Indonesia (Persero)*, 148 F.3d 127, 131 (2d Cir.1998).

■ Virtual contends that Republic has engaged in commercial activity, because "[t]he continuing battle for a stake in cyberspace is hardly the exclusive domain of sovereigns," as private persons frequently challenge domain name ownership and commence arbitrations. (Pl. Mem. at 16.) Virtual therefore concludes that the Court should accept subject matter jurisdiction here to forestall "[Republic's] misguided foray into this commercial arena." (*Id.*) However, while the Court acknowledges that a sovereign's actions in registering or challenging domain names may in certain cases qualify as "commercial," here Republic has not engaged in any transaction or course of conduct that is commercial in nature. 28 U.S.C. § 1603(d). It merely issued a press release stating that it intended to file an application with WIPO for the right to own the *southafrica.com* domain name, and "take the matter up in international fora."[8] (Press Release at 1–2.) The issuance of the Release, without more, is insufficient to establish the requisite commercial activity, because, even assuming it were a form of "public challenge" as Virtual contends, it does not constitute "trade, traffic, or commerce" within the marketplace.[9] *See Weltover*, 504 U.S. at 614, 112

---

**8.** In addition, as Republic points out, the Press Release merely mentions an "application" to WIPO, not the formal commencement of an arbitration under the UDRP. (Press Release at 1; Defendant's Reply in Support of Defendant's Motion for a Stay or to Dismiss ("Def.Rep.") at 7.)

**9.** Republic's acts would not qualify as "commercial" even if its underlying purpose is to obtain the *southafrica.com* domain name, in part, for commercial use. *See* 28 U.S.C.

§ 1603(d) (stating that "[t]he commercial character of any activity shall be determined by reference to the *nature* of the course of conduct or particular transaction or act, rather than by reference to its *purpose*") (emphasis added). Further, while the Amended Complaint alleges that Republic owns the registrations to the domain name *southafrica.net*, and that SATOUR owns *satour.org* and *satour.net*, there is no allegation that the instant action is based upon the operation of such

S.Ct. 2160; *Nelson*, 507 U.S. at 360, 113 S.Ct. 1471; *Hanil Bank*, 148 F.3d at 130 (stating that the state must act "like a private player in the marketplace" in order to be deemed to have engaged in commercial activity); *cf. U.S. Fidelity and Guar. Co. v. Braspetro Oil Servs. Co.*, 199 F.3d 94, 98 (2d Cir.1999) (finding that defendants' commercial construction projects constituted commercial activity, and its issuance of a payment default notice to co-defendants was the act in connection with such activity); *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 931 (2d Cir. 1998) (finding that defendant's sales of marketing lists amounted to commercial activity). The record reflects that, since the issuance of the Press Release, Republic has taken no further action with respect to the domain *southafrica.com* beyond its submissions to certain international bodies concerning the role of country names within domain name policy. Further, Republic has affirmatively represented that it will not commence an arbitration in WIPO or other organization under existing UDRP procedures, which suggests that it will wait to see how WIPO and ICANN resolve the proposed changes before deciding on a course of action.[10] (Ngcaba Decl. ¶ 8; Def. Rep. at 6.) Thus, even assuming that the initiation of an arbitration would constitute "commercial" activity under the FSIA, a filing by Republic does not appear imminent, thus removing the "threat" of such filing, on which the majority, if not the entirety, of this action is based. (*See* Pl.

Mem. at 17 (stating that the lawsuit "is based upon [Republic's] conduct in announcing to the world through a press release that it intended to commence an arbitration against [Virtual] challenging [Virtual's] rightful ownership of the *southafrica.com* domain name").)

Moreover, the limited activity in which Republic has engaged in support of its position concerning country domain names, namely, its presentation of position papers to WIPO and ICANN–GAC, arises from its role as policymaker within, and indirectly, regulator of, the market of Internet domain names, rather than its role as a participant in such market. Contrary to Virtual's contention, the mere fact that private parties are allowed to submit comments to WIPO concerning domain name policy is irrelevant.[11] (Pl. Mem. at 16–17 n. 18.) Republic's activities in WIPO, a UN body, and the advisory committee of ICANN comprising national states, are inherently sovereign. *See Heaney v. Government of Spain*, 445 F.2d 501, 503 (2d Cir.1971) (stating that a state's acts concerning diplomatic activity are public acts entitled to immunity).

■ Even if Republic's actions were deemed to be "commercial" under the FSIA, they would still be insufficient to trigger the commercial activity exception because they did not cause a "direct effect" in the United States. Section 1605(a)(2). The Supreme Court considered the mean-

---

domains, or acts in connection with such operation. (Amend.Compl.¶¶ 19–21.)

10. Given WIPO's views as expressed in the Interim Report, it is unlikely that WIPO will recommend or that ICANN will adopt a *per se* exclusion on ownership of country domain names by parties other than the country in question, or a binding arbitration procedure for abusive use of such names. Under such circumstances, the assertion of a claim by Republic against Virtual for ownership of the

*southafrica.com* domain would be unlikely to succeed. The issue of whether Virtual would be bound by UDRP procedures in any event through its contract with the Internet registrar, a point suggested by Republic, (Def. Mem. at 4), is unclear from the record and need not be addressed here.

11. Virtual concedes that its action is not based upon Republic's actions taken in the course of international diplomacy. (Pl. Mem. at 16–17 n. 18.)

ing of "direct effect" in *Weltover*. There, Argentina had issued bonds as part of a currency stabilization plan, which provided for repayment in United States dollars through one of several markets, namely, New York, London, Zurich, or Frankfurt. *See Weltover*, 504 U.S. at 609, 112 S.Ct. 2160. When the bonds matured, Argentina lacked sufficient reserves to pay them, so it unilaterally extended the time for their redemption. *See id.* at 610, 112 S.Ct. 2160. Two Panamanian corporations and a Swiss bank refused to accept such rescheduling and demanded full payment of the bonds in New York. When Argentina refused, these bondholders filed suit. *Id.* Having determined that the bondholders had sufficiently established that the lawsuit was based upon an act outside the territory of the United States (presumably Argentina's unilateral extension) and that such act was taken in connection with commercial activity (the issuance of the bonds), *id.* at 611–17, 112 S.Ct. 2160, the Court turned to direct effect. The Court stated that "an effect is direct if it follows as an immediate consequence of the defendant's activity," although it need not be substantial or foreseeable. *Id.* at 618, 112 S.Ct. 2160. Because the bondholders in question had designated their accounts in New York as the place of payment, thus making New York the place of performance for Argentina's contractual obligations, "the rescheduling of those obligations necessarily had a 'direct effect' in the United stated: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id.* at 619, 112 S.Ct. 2160.

In the instant case, Virtual claims that it has suffered economic loss as a direct result of Republic's issuance of the Press Release. In the Amended Complaint, Virtual states that Republic's "announced in-tention to litigate and its assertion of rights" have "plac[ed] a cloud over [Virtual] in the equity markets." (Amend. Compl.¶ 28.) In an affidavit submitted in opposition to defendants' motion to dismiss, Virtual's president and CEO, Gregory Paley ("Paley") elaborates on the "cloud," stating that the release had a "devastating and direct effect ... on [Virtual's] short and long term business operations, [which] ... threatens [Virtual's] continued corporate existence." (Paley Decl. ¶ 10.) In particular, Paley states that Virtual has had difficulty "compet[ing] with other ventures for a share of what is now a limited pool of available capital," and that the controversy surrounding the Release has negatively impacted Virtual's cashflow and company morale. (*Id.* ¶ 11.) He also states that one of several companies that has approached Virtual with an interest in a joint business relationship pulled out of preliminary discussions concerning an alliance related to *southafrica.com* because it "feared that a partnership with us could result in reprisals from the South African government." (*Id.* ¶ 13.) Paley concludes that Virtual "urgently requires a ruling from this Court" that Republic "has no basis to publicly challenge" Virtual's ownership of the *southafrica.com* domain name. (*Id.* ¶ 16.)

The Court finds that Paley's allegations are insufficient to establish the requisite direct effect under Section 1605(a)(2). Virtual's allegation of a loss of competitiveness from the Press Release that has jeopardized the company's entire corporate existence is entirely conclusory; Paley states only that certain unspecified United States investors who initially expressed an interest in investing, later decided not to invest. (Paley Decl. ¶ 12.) To the extent that Virtual has encountered

problems raising money from investors, such problems would more plausibly be the result of the "limited pool of available capital" for dot-com concerns, rather than Republic's Press Release.[12] Moreover, Virtual's statements as to the purported negative impact on its cashflow caused by the Press Release are conclusory and vague,[13] and the alleged harm to company morale, as an outgrowth of the alleged reduction in competitiveness and cashflow problems, is clearly not an immediate consequence of Republic's actions. Finally, Virtual does not provide any details concerning the potential partner that pulled out of negotiations for fear of reprisals from Republic, the type of partnership that was envisaged, or the injury that Virtual allegedly suffered as a result.

▆▆▆ Thus, Virtual has not established, under the standard set forth in *Weltover,*

that Republic's actions had a "direct effect" in the United States. Moreover, Virtual's allegations fail to satisfy its burden for an independent reason, namely, that an undefined financial loss such as that which is alleged, without more, is not sufficient to trigger the commercial activity exception. *Antares Aircraft, L.P. v. Fed. Republic of Nigeria,* 999 F.2d 33, 34–35 (2d Cir.1993) ("[T]he fact that an American individual or firm suffers some financial loss as a result of a tort cannot, standing alone, suffice to trigger the [commercial activity] exception."). The Second Circuit held in *Antares* that jurisdiction under the FSIA does not lie where, as here, all "legally significant acts" occur outside the United States. *Id.* at 36–37; *Filetech,* 157 F.3d at 931; (Pl. Mem. at 19 (stating that Republic's "public challenge" of Virtual's ownership in the Press Release was the "legally significant conduct" in this case).) While

**12.** The Court takes judicial notice of the financial hardship experienced by Internet-based businesses operating in the electronic commerce industry, or "dot-coms," following the decline of the technology-laden NASDAQ stock market in mid–2000. *See* Fed.R.Evid. 201 (stating that "[a] court may take judicial notice, whether requested or not ... [of] a fact ... not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"). Moreover, as noted *supra,* the Press Release merely expressed Republic's intention to challenge the *southafrica.com* domain in WIPO. Given that unlikelihood that a challenge under current UDRP procedures would succeed, *see supra,* it is unlikely that the Release would have an effect on venture investors. Rather, it is more likely that the WIPO and ICANN rulemaking processes themselves may have caused investor jitters, as these two organizations have indicated their intention to discuss country names as part of the WIPO–2 process, with an eye to amendment of the UDRP.

**13.** Paley states that Virtual's ability to raise capital has been

so severely hampered by the cloud placed by [Republic] on [Virtual's] assets that [Virtual] has recently had no choice but to engage in an act of economic cannibalism: it has had to sell one of its country-specific domain names, *switzerland.com,* solely in an effort to meet its operating expenses. Of course, in order to continue to be successful, [Virtual] would like to continue to acquire more country-specific domain names, not sell the ones it currently has.

(Paley Decl. ¶ 12.) Such statement reveals that Virtual has successfully generated cashflow by selling off some of its property. In addition, Paley's suggestion that such sales are not desired is contradicted by the fact that the *southafrica.com* domain was listed for sale for $5 million at a domain name sale site, *greatdomains.com,* as recently as July 20, 2000. (Reply Declaration of David B. Goldstein dated May 21, 2001, Ex. 3.) Also, in its submission to ICANN–GAC, Republic stated that, at a certain point in 2000, Virtual had offered to sell them the domain name for a payment of between $5 million and $10 million. (Ex. 2 to Ngcaba Decl. at 4.)

the court's holding in *Antares* related to a tort cause of action, and in certain cases such holding may not apply to a contract action, the "legally significant acts" test is equally applicable to Virtual's allegations here, which are more akin to tort (e.g. defamation) than to contract.[14] *Cf. Hanil Bank*, 148 F.3d at 133 (stating that the test was "not directly applicable to the *contract* at issue," but nevertheless finding that "the most legally significant act—the breach of contract—occurred in the United States"); *Antares*, 999 F.2d at 36 (discussing *Weltover* and stating that the legally significant act in that case was the breach that occurred in New York); *Martin v. Republic of South Africa*, 836 F.2d 91 (2d Cir.1987) (finding that financial injury of person injured abroad is not a "direct ef-fect" in United States); *Zernicek v. Brown & Root, Inc.*, 826 F.2d 415, 418 (5th Cir. 1987) (stating that "consequential damages [from personal injury tort abroad] are in-sufficient to constitute a 'direct effect in the United States' for purposes of abrogat-ing sovereign immunity").

▇▇▇ Accordingly, the Court finds that it lacks subject matter jurisdiction to hear this action, against either Republic or SATOUR, under the FSIA.[15]

## C. Dismissal of SATOUR

▇▇▇ Republic moves separately to dismiss SATOUR from this action pursu-ant to Rule 12(b)(6) for failure to state a claim.[16] Because SATOUR is an agency

---

14. In support of its contention that Republic's action caused a direct effect in the United States, Virtual relies on *Texas Trading & Mill-ing Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 312 (2d Cir.1981), for the statement that "the relevant inquiry is whether the cor-poration has suffered a 'direct' financial loss." (Pl. Mem. at 20–22.) However, this case was decided before the Second Circuit's adoption of the "legally significant acts" test in *Antares*. Moreover, even under *Texas Trading*, Virtual's alleged financial loss would not satisfy its burden under the FSIA because the loss in question was not an immediate consequence of Republic's specific acts. The Court also rejects Virtual's attempt to distinguish *Antares* on the ground that plaintiff there was a part-nership, rather than a corporation as Virtual is here. (Pl. Mem. at 21 n. 20.) Nothing in the decision suggests that corporations are not encompassed by the holding. *See Antares*, 999 F.2d at 36 ("To be sure, the detention of Antares' sole asset affected the financial well-being of the American partnership. However, the fact that an American individual or firm suffers some financial loss from a foreign tort cannot, standing alone, suffice to trigger the exception.").

Further, Virtual's allegations of direct effect on "numerous other private U.S. corporations which own or perform services in connection with websites using a country name in the second-level domain" is entirely speculative and conclusory. (Pl. Mem. at 22.) Nor would Congress' purported interest in "pro-tecting its nascent dot-com industry," in the face of "economic darts" thrown by foreign countries, support FSIA jurisdiction here. *Cf. Weltover*, 504 U.S. at 618, 112 S.Ct. 2160 (rejecting the Second Circuit's finding of di-rect effect on the ground that Congress "would have wanted an American court to entertain this action in order to preserve New York City's status as a preeminent financial center"; "[t]he question … is not what Con-gress 'would have wanted' but what Congress enacted in the FSIA").

15. Because the Court dismisses the action under the FSIA, it need not consider Repub-lic's motion for a stay or its argument that there is no case or controversy permitting the Court to entertain this action under the De-claratory Judgment Act. The Court notes that such Act is not an independent basis for sub-ject matter jurisdiction. *See Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 594 (2d Cir.1996).

16. In deciding a motion under Rule 12(b)(6), the Court may consider "facts stated on the face of the complaint and in documents ap-pended to the complaint or incorporated in the complaint, as well as [ ] matters of which judicial notice may be taken." *Automated Salvage Transport, Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 67 (2d Cir.1998).

or instrumentality of Republic, the Court lacks subject matter jurisdiction under the FSIA to hear the action against SATOUR. *See supra.* Moreover, even if SATOUR were not an agency or instrumentality of Republic, Virtual has not stated a claim against SATOUR because SATOUR is not alleged to have performed any act apart from its actions as an agency of Republic, let alone an act resulting in injury to Virtual. *See Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996) (stating that "bald assertions and conclusions of law" do not suffice to defeat a motion to dismiss under Rule 12(b)(6)). Accordingly, the action must also be dismissed as to SATOUR under Rule 12(b)(6).

### III. Conclusion

For the foregoing reasons, defendants' motion to dismiss is granted. The mere fact that Virtual operates in the volatile electronic commerce industry and is seeking to raise capital under sensitive economic conditions is not grounds for assuming jurisdiction over a foreign sovereign which has performed no commercial act with respect to the subject matter of this dispute. Accordingly, the action is dismissed. The Clerk of the Court is directed to close the file in this action.

SO ORDERED.